Jeffrey L. Rosenberg (JR-3597)
JEFFREY L. ROSENBERG
    & ASSOCIATES, L.L.C.
Attorneys for Plaintiffs,
AIS Ventures, LLC and Andrew Smoler
46 Morgan Drive
Old Westbury, New York 11568
(516) 626-1325

**CV - 08   3622**

FILED
IN CLERK'S OFFICE
U.S DISTRICT COURT E.D N.Y

★   SEP 0 4 2008   ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

(S)

WEXLER, J.

BOYLE, M.

----------------------------------------------------------X

AIS Ventures, LLC, and ANDREW SMOLER,
as Trustee, acting by and through the Andrew
Smoler 401K Investment Retirement Account
          Plaintiffs

    -against-

MICHAEL J. XIRINACHS, JOHN LIVECCHI,
ROBERT ROCCO, EMERALD
CAPITAL PARTNERS, LP, EMERALD
CAPITAL PARTNERS, LLC, EMERALD
ASSET ADVISORS, LLC, SAND STONE
INVESTMENT PARTNERS, LLC and
JOHN DOES 1 THROUGH 5.
          Defendants.

----------------------------------------------------------X

:   **COMPLAINT
AND DEMAND
FOR JURY TRIAL**

**ORIGINAL**

     Plaintiffs, AIS Ventures, LLC ("Ventures"), and Andrew Smoler ("Smoler"), as

Trustee, acting by and through the Andrew Smoler 401K and the Andrew Smoler Investment

Retirement Account (collectively, "Smoler"), (Ventures and Smoler are sometimes hereinafter

collectively referred to as "Plaintiff" or "Smoler"), as and for Plaintiff's complaint against the

Defendants herein, allege as follows:

## JURISDICTION

     1.     This Court has subject matter jurisdiction to determine the federal securities law

claims asserted in this action, pursuant to Section 27 of the Securities Exchange Act of 1934

(the "Exchange Act"), and 15 U.S.C. §78aa, and 28 U.S.C. §1331, and §20(a) of the

Exchange Act, 15 U.S.C. §78t(a).

2.     This Court also has jurisdiction over and with respect to this matter pursuant to 28 U.S.C.A. § 1332, in that there is complete diversity of citizenship between Plaintiff(s) and all Defendants, and the matter in controversy herein is in excess of $75,000.00.

3.     This Court has supplemental subject matter jurisdiction to determine the state law claims asserted in this action pursuant to 28 U.S.C. §1367(a).

## PARTIES

4.     Plaintiff, Smoler is a citizen of the State of Florida, and currently is a resident of the Republic of Singapore.

5.     Plaintiff, Smoler is the sole Trustee of the Andrew Smoler 401K Investment Retirement Account; and is exclusively authorized to act for the Andrew Smoler 401K Investment Retirement Account.

6.     AIS Ventures, LLC, is a Limited Liability Company formed and existing under the laws of the State of Florida.  The mailing address and principal office for Ventures is c/o Bruce J. Smoler, Esq., Smoler, Lerman, Bente & Whitebook, P.A., 2611 Hollywood Boulevard, Hollywood, Florida 33020.   Smoler is the Managing Member of Ventures, and the person who is solely authorized to act for and on behalf of Ventures.

7.     Although Smoler acted in and with respect to the investments and purchase of the securities described herein, including taking action by and through the entities and facilities wholly owned and controlled by him, Smoler is in all respects the real party in interest with respect to all transactions and occurrences and all actions taken by him, as described herein.

8.     Upon information and belief, defendant, Michael J. Xirinachs ("Xirinachs"), is a citizen and resident of the State of New York, who maintains his principal office at 425 Broad Hollow Road, Melville, New York 11747.

9.     Upon information and belief, defendant, John Livecchi ("Livecchi"), is a citizen and resident of the State of New York, who resides at 41 High Pasture Circle, Dix Hills, NY 11746; and who, during the times relevant herein, maintained an office for the conduct of his business at 425 Broad Hollow Road, Melville, New York 11747.

10.     Upon information and belief, defendant, Robert ("Bob") Rocco ("Rocco"), is a citizen and resident of the State of New York, and maintains his principal office at 425 Broad Hollow Road, Melville, New York 11747.

11.     Upon information and belief, defendant, Emerald Capital Partners, LP ("Emerald"), is, and at all relevant times herein, was a Limited Partnership organized and existing under the laws of the State of Delaware, with its principal place of business located at 425 Broad Hollow Road, Melville, New York 11747.

12.     Upon information and belief, defendant, Emerald Capital Partners, LLC ("Emerald LLC"), is, and at all relevant times herein, was a Limited Liability Company organized and existing under the laws of the State of New York, with its principal place of business located at 425 Broad Hollow Road, Melville, New York 11747.

13.     Upon information and belief, defendant, Emerald Asset Advisors, LLC ("Advisors"), is, and at all relevant times herein, was a Limited Liability Company organized and existing under the laws of the State of New York, with its principal place of business located at 425 Broad Hollow Road, Melville, New York 11747.

14.     Upon information and belief, defendant, Sand Stone Investment Partners, LLC ("Sand Stone"), is, and at all relevant times herein, was a Limited Liability Company organized and existing under the laws of the State of New York, with its principal place of business located at 425 Broad Hollow Road, Melville, New York 11747.

15.     Upon information and belief, at all relevant times relevant herein, Xirinachs was the General Partner and the controlling and/or managing agent of Emerald, and therefore is and was at all times relevant herein, a "controlling person" with respect to Emerald, as that term is defined in Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), in that Xirinachs alone, or together with one or more other individuals controlled and/or controls, directly or indirectly, the activities, business, management and affairs of Emerald.

16.     Upon information and belief, at all relevant times relevant herein, Xirinachs was the Managing Member and the controlling and/or managing agent of Emerald LLC, Advisors,

and Sand Stone, and therefore is and was at all times relevant herein, a "controlling person" with respect to each of those entities, as that term is defined in Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), in that Xirinachs alone, or together with one or more other individuals controlled and/or controls, directly or indirectly, the activities, business, management and affairs of Emerald LLC, Advisors and Sand Stone.

17.    Upon information and belief, at all times relevant herein, Xirinachs acted both in word and deed on an individual basis, and concurrently as an authorized agent for Emerald, Emerald LLC, Advisors and Sand Stone, in his capacity as the General Partner of Emerald and the Managing Member and/or managing agent for Emerald LLC, Advisors and Sand Stone.

18.    Upon information and belief, at all times relevant herein, Livecchi and Rocco acted both in word and deed on an individual basis, and concurrently, as authorized agents for Emerald, Emerald LLC, Advisors and Sand Stone.

19.    Upon information and belief, each of Livecchi and Rocco were authorized by Xirinachs to act for and on behalf of him, and each of Emerald, Emerald LLC, Advisors and/or Sand Stone to solicit capital funds and financing designated and to be designated as loans to be made to Emerald, Emerald LLC, Advisors and/or Sand Stone (the "Emerald Loan Solicitations").

20.    Upon information and belief, prior to 2003 Livecchi obtained a license for the sale of securities from and through the National Association of Securities Dealers ("NASD") upon successfully passing a Series "7" and a Series "66" examination.

21.    Upon information and belief, Livecchi was employed as an NASD broker by Merrill Lynch from August, 2003 through November 2, 2005; and was employed as an NASD broker by CitiBank Investment Corp. from November, 2005 through May, 2007, during each of which employments and employment periods he was engaged in the business of selling securities and financial instruments (which come within the umbrella of the term securities), and during those times, and, upon information and belief during the times relevant herein, he was subject to supervision and regulation by the NASD.

4

22.     The purpose of the Emerald Loan Solicitations was to obtain funds by loans and/or other capital financing in the sum of $4 million (the "Emerald Loans") to fund the purchase by Emerald, Emerald LLC, Advisors and/or Sand Stone of all of the assets, stock or equity interests of Tobacco Holdings, Inc. ("TH"), an international manufacturer and importer of premium cigarettes for an agreed purchase price (the "TH Purchase Transaction").

23.     Upon information and belief, each of Xirinachs, Livecchi and Rocco, together with one or more other persons, including Emerald, Emerald LLC, Advisors, Sand Stone and/or Carl Nappi, who was President of Sales and Marketing for Emerald, worked jointly, as partners or joint venturers, and otherwise worked in concert, and colluded and conspired with one another in making the Emerald Loan Solicitations, and in soliciting one or more investors, including Plaintiff, to make the Emerald Loans, in turn to provide the capital funding and financing needed to consummate the TH Purchase Transaction.

24.     John Does 1-5 are individuals and/or entities, some of whom are unknown to Plaintiff at this time, who or which reside in or maintain their principle place of business in the State of New York and in the District in which this Court is located.

### FACTS COMMON TO ALL CLAIMS

**A.     THE "TH PURCHASE TRANSACTION"**

      **I.     Summary Of Financial Terms Of The Investment:**

25.     The TH Purchase Transaction is more fully described in an "Information Package", entitled: "Purchase of Tobacco Holdings, Inc.", dated October, 2006, prepared by Emerald (the "TH Information Package"). (A copy of the TH Information Package, as provided to and as received by Plaintiff, is annexed hereto as Exhibit "A").

26.     The Information Package[1] contemplated the following terms:

      (a)     Only Qualified Investors could make the Emerald Loans to Emerald;

---

[1]     As supplemented by the express, repeated and continuing representations of Xirinachs, Livecchi and Rocco, individually and in concert, as set forth herein.

(b)     The minimum loan amount was to be $50,000.00 per qualified investor/lender;

(c)     The Emerald Loans were to bear interest at the rate of between 18% and 21% per annum, compounded monthly; with investors having the option of receiving interest payments on a quarterly or annual basis;

(d)     The terms of the Emerald Loans would require a commitment with respect to the loan of capital for up to twenty four (24) months from the date any such loan was extended to Emerald, with a minimum of fifteen (15) months as the "Initial Lending Period"; provided that in certain circumstances, upon the imposition of certain penalties an investor/lender could withdraw his, her, or its capital sooner than twelve (12) months of the making of any Emerald Loan;

(e)     All Qualified Private Lenders making the Emerald Loans, in addition to the interest payable and accruing on such loan would be entitled to receive a one time bonus, equal to seventy-five (75%) of the amount of their respective Emerald Loan, without consideration of interest thereon, the realization of and entitlement to which was conditioned on Emerald, or its subsidiary formed for that purpose, achieving a sale of TH subsequent to the purchase of that Company by Emerald at a minimum sales price of $60 million (the "Back End Bonus");

(f)     Emerald and Xirinachs represented and confirmed to Plaintiff and other qualified investor/lenders that it and he would stand behind and fully and unconditionally guarantee the repayment of all principal and the payment of all interest accrued in favor of each Qualified Private Lender making an Emerald Loan, regardless of the final consummation of the TH Transaction, and/or the subsequent sale of TH to another and a subsequent buyer. In support of this guarantee, the Information Package represented as follows: "The financial strength and assets of the $600,000,000.00 fund will support this guarantee";

(g)     Subsequent to the delivery of the Information Package to Plaintiff both by mail by Livecchi, and by e-mail, by Rocco, Xirinachs also expressly agreed to personally

6

guaranty the repayment of the Emerald Loans, and agreed to collateralize such guaranty with his equity interest in Emerald, which he represented to be $5.5 million (USD), and which he further represented would be held in a segregated account within Emerald, which could not be reached by third party creditors, and which would stand as a pledge by Xirinachs in support of his guaranty of the repayment of all principal and interest on and with respect to the Emerald Loans;

(h)     Emerald would utilize all proceeds from the Emerald Loans for the sole and exclusive purpose to fund the purchase and expansion of TH; and pending the use and application of those loan proceeds for and with respect to the TH Purchase Transaction, such loan proceeds would be "placed in a separate contribution account at HSBC [Bank] for the sole purpose of the Tobacco Holdings, purchase";

(i)     While investors were to be entitled to receive the return of their Emerald Loan proceeds, and interest thereon at the prescribed and agreed upon rate, and while they were to be entitled to the Back End Bonus if a sale of TH is consummated at $60 million or more, such lenders were not to participate in the general success of TH, and/or with respect to any profit derived by Emerald from or with respect to TH, directly or indirectly; and this was presented as the justification for guarantying the repayment of the Emerald Loans, with interest thereon;

(j)     Promissory Notes were to be issued by Emerald to evidence the Emerald Loans in consideration of the delivery loan proceeds; and interest was to be paid on such Emerald Loans from the respective dates on which such loans were made;

(k)     Subsequently, after Plaintiff purchased its securities herein referred to, it was represented that the Promissory Note and a Note Purchase Agreement would be issued by Advisors, and that Advisors would fully guaranty the repayment of all Emerald Loans. Upon information and belief, it was in anticipation of this switch and/or to maintain flexibility thereto, it was for this reason that the Advisors' Profit and Loss Statement was included within the Information Package.

## II.   Summary of Substantive Business Terms of the TH Purchase Transaction:

27.   The Information Package[2] contained the following substantive descriptions of the TH Purchase Transaction, which were also amplified and elucidated by statements, representations and assurances made by Xirinachs, Livecchi and Rocco as detailed below herein:

(a)   TH is an international manufacturer and importer of premium cigarettes;

(b)   TH's leading high-quality, value-priced brands include Jim Porter, Bridgeport, Yukon, Bayport, Calon and boasts the experience and resources required to exceed its customers' most stringent expectations;

(c)   Unlike its value-priced competition, TH has successful experience working with some of the country's largest retail chains and distributors;

(d)   Nonetheless, the owner of TH is compelled to sell TH because his personal life had taken an adverse turn, based both on health and divorce issues;

(e)   As a partial result of those circumstances, the per month carton turnover of TH had decreased to just 35,000 cartons per month;

(f)   The owner/seller has a relationship with the General Partner, or one of more associates or affiliates of Emerald; and on that basis the owner/seller of TH approached Xirinachs and Emerald to assist such owner/seller in the sale of TH, including through one or more associates, affiliates and/or subsidiaries of Emerald and/or Xirinachs;

(g)   Approximately contemporaneously, Xirinachs was approached or knew of a person or an entity who, or which, was a client of, or investor in Emerald, and who was desirous of purchasing a tobacco company manufacturer and wholesaler; and who, or which, was a "major" player and owner in the tobacco industry, with a solid reputation, who was seeking to expand the operations of the interests he owned;

(h)   Xirinachs, directly, or through Emerald, or one or more affiliates, associates, subsidiaries, or controlling or controlled persons, thereafter negotiated the terms of both the purchase of TH from the owner/seller thereof, and the sale of TH by or through Emerald, or

---

[2]   See fn. "1" above.

its wholly owned subsidiary, to this prospective buyer, who committed to the purchase of TH from and in the hands of Emerald or its subsidiary;

(i)     The purchase price for the sale of TH to Emerald, or its subsidiary, was negotiated and fixed at $4 million.  Livecchi later advised and represented to Plaintiff that Xirinachs had subsequently negotiated and obtained a reduction in the purchase price for the acquisition of TH;

(j)     The sale price for the subsequent sale of TH to a "major player" in the tobacco industry was negotiated and fixed at $60 million, which held in prospect a gross profit of approximately $56 million to be derived by Emerald, or its subsidiary; provided however, it was a stated condition to that purchase of TH from Emerald, or its subsidiary, that TH had to first increase its minimum monthly per carton volume to 400,000 cartons per month; and it was required to maintain that minimum volume level for a period of six (6) consecutive months.

(k)     Once the 400,000 carton monthly volume condition was satisfied, the condition(s) of the pending contract between Emerald, and/or its subsidiary, and the proposed purchaser of TH would be deemed satisfied, and the transaction would be closed, subject to the final approval by the Tobacco Trade Bureau of the United States Government;

(l)     It was represented by Xirinachs, Livecchi and Rocco that not only had the forgoing negotiations and terms been agreed upon, but contracts embodying those terms had been drafted and consummated;

(m)     The Emerald subsidiary specified to consummate the purchase and sale of TH in the foregoing scenario was Sand Stone; and it was represented by Xirinachs, Livecchi and Rocco, acting in concert, that Sand Stone was wholly owned by Emerald;

(n)     Alternatively, and inconsistently, subsequent to Plaintiff's purchase of its limited partnership interests in Emerald, it was represented that such purchase of securities and investment was in and with respect to Advisors, and not in and with respect to Emerald; and it was concomitantly represented that Advisors would be entering into the TH Purchase

9

Transaction through "a separate company, Sandstone Investment Partners...established through the Hedge Fund Emerald Asset Advisors for the specific purpose of purchasing Tobacco Holdings."

(o)     The Information Package specified that if the purchaser did not consummate the purchase of TH from Sand Stone, Emerald had secured a second purchaser for the purchase of TH from Sand Stone; and that if this second purchaser also did not consummate a purchase of TH, Emerald would consider taking TH public in an Initial Public Offering ("IPO");

(p)     The new management team already then put in place by Emerald was stated to have more than thirty (30) years of combined experience in the manufacturing and distribution of cigarettes, and as having nationwide market penetration, as well as in Puerto Rico;

(q)     The "new management team" was stated to have already arranged for and put in place contracts to increase the monthly carton volume of TH up to 300,000 cartons per month; and it was stated there were already hard and concrete discussions taking place for the remaining increase of another 100,000 cartons per month--making the new management team feel "very" confident that they would achieve and satisfy the required condition precedent to the purchase of TH from Emerald, or its subsidiary. More specifically, the Information Package stated that:

> "The new management group has already secured deals with several foreign entities to help achieve this goal [i.e., 400,000 cartons of cigarette sales for a minimum six month period]; and there are additional pending deals in the offing. New product lines are also being added to ensure the sales goal is met and surpassed";

(r)     Subsequent to Plaintiff making the Emerald Loans and/or subsequent to Plaintiff's purchase of limited partnership interests in Emerald, it was inconsistently represented that these contracts to increase the per month carton volume of TH would only go into effect from and after the closing of the purchase by TH by Sand Stone;

10

(s)    The time-line anticipated for completion of the sale of TH to Emerald's purchaser was stated to be less than two (2) years; although Emerald stated that it believed it would actually take just over one (1) year to complete;

(t)    Funding for the TH Purchase Transaction through the Emerald Loans was to be finalized in mid to late November, 2006; but later that representation was stated to imminently be ready to occur in February, 2007;

(u)    To the extent that Qualified Investors did not provide all or any part of the Emerald Loans necessary to fund the purchase of TH by Emerald, or its subsidiary, Emerald and/or Xirinachs represented that he, it or they would fund any deficiency of any capital funds needed to consummate that transaction;

(v)    To further induce Plaintiff to make one or more Emerald Loans, Plaintiff was advised by Livecchi in the first instance, acting as the agent for Emerald, Emerald LLC, Advisors, Sand Stone and/or Xirinachs, that investor/lenders would make money in two ways: first, Plaintiff would be entitled to receive interest on the principal amount of its Emerald Loan at the rate of 21% percent per annum, compounded monthly, until all and the entire principal balance of such Emerald Loan was repaid, which was to be evidenced by a promissory note that would be issued by Emerald; and second, if and when TH was sold by Emerald, or its subsidiary, for a gross sales price of not less than $60 million dollars, Plaintiff would be entitled to receive the Back End Bonus, equal to 75% of the principal amount of Plaintiff's Emerald Loan;

(w)    The term of the Emerald Loans was to extend for a maximum of twenty four (24) months from the date the loan was made; provided however, that Plaintiff was advised by Livecchi that at any time after twelve (12) months from and after the date

11

that an Emerald Loan was made, Plaintiff and the other qualified investor/lenders could withdraw his and/or their funds, together with all accrued interest thereon, and receive payment of the entirety of the principal on account of such Loan, together with all accrued interest thereon, conditioned on the giving of three (3) months' prior written notice to Emerald regarding the exercise of this right of withdrawal--thus providing for a minimum loan period of fifteen months.  In such event, it was expressly stated that despite any such "early withdrawal" on three months' advance written notice (a total of 15 months after investment), a qualified private lender would still be entitled to receive the Back End Bonus to the extent that the TH Purchase Transaction was subsequently consummated based on a $60 Million sales price; provided however, it was stated that an investor would forfeit the Bonus and would have a 15% interest penalty imposed if such investor withdrew his, her or its loan capital prior to twelve months from the date any such loan was made;

(x)     Inconsistent with the representations made by Defendants with respect to the two ways that Plaintiff would make money from making an Emerald Loan, on or more subsequent drafts of the Promissory Note, provided that if Plaintiff exercised the right of withdrawal after twelve months, and thereafter even if on three months' prior written notice (15 months after the loan was made), Plaintiff would forfeit any right to receive the Back End Bonus;

(y)     For purposes of the security and safety of the investors' funds until they were utilized for the TH Purchase Transaction, Livecchi, Xirinachs and Rocco represented to and assured Plaintiff that the Emerald Loan proceeds were to be held in a segregated account in the name of Emerald, maintained at Hong Kong and Shanghai

12

Banking Corp, ("HSBC"); and they each represented that the entirety of the proceeds from the Emerald Loans, together with all accrued interest thereon, was to be evidenced by a promissory note, which was to be guaranteed by both Emerald and Xirinachs; and that repayment within the time frame of the Emerald Loans, as compared to the Back End Bonus, was fully guaranteed, and was not conditioned in any manner on the sale by Emerald, or its subsidiary, of TH at a sales price of $60 million or more, or at any other price;

(z)     Despite representations to the contrary, no Promissory Note and/or Note Purchase Agreement was provided to Plaintiff despite the fact that Plaintiff made two separate Emerald Loans in December, 2006 and February, 2007; and in fact, subsequent to Plaintiff's investment the terms of the promissory note was altered and changed by Defendants; even after Plaintiff's investment had been consummated in the first instance in December, 2006—to the extent that it was later provided that such note and purchase agreement were to be issued by a borrower other than Emerald;

28.     Upon information and belief, John Does 1-5, inclusive of Carl Nappi, are other individuals and entities some of whom are unknown to Plaintiff at this time, who participated with Defendants and aided and abetted and colluded with them in making false and misleading representations which were intended to and which had the effect of inducing and facilitating the investment by Plaintiff, including through the use of instrumentalities of and in interstate commerce.

**B.     CHRONOLOGY AND TIME LINE OF MISREPRESENTATIONS
        AND OTHER CULPABLE CONUCT AND ACTIONS BY DEFENDANTS**

29.     In or about August through September, 2006, Livecchi contacted Plaintiff by telephone and pursued and engaged in making the Emerald Loan Solicitations. He called Plaintiff several more times during this period to repeat and to continue to pursue the Emerald Loan Solicitations. At the time of these initial solicitations Plaintiff had not yet received the Information Package.

30.     After Livecchi had pursued approximately two or three Emerald Loan Solicitations by telephone, he arranged to meet Plaintiff in New York City, and further pursued the Emerald Loan Solicitations.

31.     Upon information and belief, irrespective of his then relationships with Emerald, Xirinachs and/or Rocco, at the time of the initial and continuing contacts and solicitations in August through September, 2006, Livecchi was also employed as a broker for CitiBank Investments Corp., and maintained a then current NASD broker's license. On that basis and otherwise, Smoler believed and perceived that Livecchi was a person of integrity, bound to make full disclosure to Smoler with respect to the sale of any securities.

32.     Plaintiff had otherwise known and done business with Livecchi for more than ten (10) years prior to the Emerald Loan Solicitations, knew that he was an NASD registered broker, and also and otherwise knew him to be trustworthy and reliable based on that relationship and those facts and circumstances.

33.     In the course of his contacts with Plaintiff in August through September, 2006, Livecchi detailed all of the facts and terms regarding the TH Purchase Transaction and the Emerald Loans set out above.

14

34.    In addition, in the course of these discussions and solicitations, Livecchi described himself and Rocco as the principal partners with Xirinachs in the TH Purchase Transaction, and stated, in words or substance, that he and Rocco were acting as agents and authorized representatives for and on behalf of the "Emerald Entities" (referring to and meaning collectively, Emerald, Emerald LLC, Advisors and Sand Stone) in making the Emerald Loan Solicitations;

35.    In furtherance of confirming his role in and the status and terms of the TH Purchase Transaction and the Emerald Loans, and his authority to speak for and on behalf of the Emerald Entities and Xirinachs, Livecchi represented to Plaintiff that if Emerald successfully consummated the sale of TH, upon satisfying the proposed buyer's condition precedent of achieving an increased monthly volume of 400,000 cartons for six (6) months, he would be entitled to receive a percentage of the proceeds of the sale of TH by Emerald, or Sand Stone; although he did not disclose the percentage or quantify the amount he would receive at this time.

36.    It was only after Plaintiff completed his investment and only after Defendants failed and refused to repay the principal and accrued interest on Plaintiff's Emerald Loan that, in or about April/May/June, 2007, Livecchi disclosed that he would receive $7 million if the TH Purchase Transaction closed at a price of $60 million or more on the sell side.

37.    At or about October 16, 2006 Rocco forwarded the Information Package to Plaintiff by e-mail, advising him to call Rocco at (631) 396-3958 if he had any additional questions.   Rocco thereafter forwarded the first drafts of the Note on or about October 26, 2006, also by e-mail.

15

38.     In addition, upon information and belief, Livecchi transmitted the Information Package to Plaintiff by United States Mail from his office in Melville, NY to Plaintiff's post office box then maintained in New Jersey.

39.     At or about the time that the approximately concurrent time that the Information Package was provided to Plaintiff by Livecchi and Rocco, Livecchi advised Plaintiff that while Plaintiff would receive a 21% interest coupon on Emerald Loans made by Plaintiff, which was to be compounded monthly, other qualified private investors would receive only an 18% coupon.

40.     It was explained by Livecchi that the difference in the interest rates being paid to Plaintiff, as compared to other investors that he had solicited, was attributable to the fact that as to Plaintiff, but not other lenders, Livecchi was waiving the three (3) percent "rake-off" of the interest to be paid under the Emerald Loans, which, but for such waiver, he would be entitled to receive on all loans generated by him.

41.     Livecchi expressly requested that Smoler not disclose that he was receiving 21% in accrued interest on Plaintiff's promissory note, since Livecchi was not offering that interest rate to others; although upon information and belief one or more of the other investors also received a 21% coupon, despite this attempt to make it look like Plaintiff was getting a "special" or most favorite deal.

42.     Subsequent to Plaintiff receipt of the Information Package, Livecchi, together with Rocco, in the course of several telephone conference calls they made to Smoler during October, 2006, initiated from the Emerald Entities' offices at 425 Broad Hollow Rd., Melville, New York 11747, described the opportunity detailed in the Information Package as a "can't

lose", "once in a lifetime opportunity"; which Plaintiff interpreted to mean that such investment had a very high degree of safety.

43.     More specifically, Livecchi together with Rocco, explained that they used the words "can't lose" and "once in a lifetime opportunity" in terms of the Emerald Loan featuring a high interest rate with the Back End Bonus, while being fully guaranteed by both Emerald and Xirinachs; and because the Emerald Loan proceeds were to be deposited in a separate "escrow account" at HSBC, to be held for the sole and exclusive purpose and use of consummating the TH Purchase Transaction.

44.     This characterization was amplified by both Livecchi and Rocco upon repeated confirmations to the effect that the repayment of the promissory note to be issued to evidence the Emerald Loans was to be guaranteed both by Emerald, which fund had a market value of more than $600 million, and by Xirinachs, who would segregate not less than $5.5 million (USD) of his equity interest in Emerald for the purpose of such guaranty.

45.     Upon information and belief, in making these and the representations subsequently made to the same effect, Xirinachs, Livecchi and Rocco were interchangeably and alternatively referring to Emerald, Emerald LLC and Advisors.

46.     Thus, in these telephone calls initiated from Emerald's offices in October, 2006, Livecchi and Rocco repeatedly reiterated that the proceeds from the Emerald Loans would be deposited in a separate cash account maintained by Emerald at HSBC, and would be held in US Dollars; and confirmed that the full amount of such loans was fully guaranteed and would be fully paid, including as to principal and accrued interest thereon, without regard to whether the TH Purchase Transaction was consummated as to either the purchase or sale by Emerald, or its subsidiary.

47.    On October 27, 2006 a conference call was initiated from Emerald's offices to discuss the Emerald Loans and the TH Purchase Transaction (the "October 27, 2006 Conference Call").

48.    The October 27, 2006 Conference Call was initiated and conducted by Xirinachs, Livecchi and Rocco, and was participated in by Plaintiff and a prospective investor solicited by Livecchi.  During this Conference Call, Plaintiff was physically located at his then apartment in New Jersey, and upon information and belief, Xirinachs, Livecchi and Rocco were physically located in Emerald's/Xirinachs' principal offices at 425 Broad Hollow Hill Road, Melville, New York.  The October 27, 2006 Conference Call lasted about 40 minutes.

49.    To clarify and reconfirm some of the issues discussed and the representations made in the course of the October 27, 2006 Conference call, Smoler, by an e-mail transmitted on October 30, 2006, among other things, inquired as to whether Xirinachs' pledge of his "equity stake" Emerald to secure the Emerald Loans would be fluctuating with the marked or segregated and secure.

50.    In response to Smoler's inquiry, by a return e-mail transmitted by Xirinachs to Smoler on October 30, 2006, Xirinachs represented the following (sometimes hereinafter referred to as the "$5.5 Million Assurance"):

> "My equity stake which as of Oct. 31st [2006] is $5.5MM will be held in a cash position USD throughout the term of the note. It will be kept in the fund [presumably Emerald or Advisors] if nothing else to provide leverage. It will not be put at risk throughout the term of the note. Basically if the fund blows up because these funds were in essence pledged against a guarantee they can never be used to satisfy any calls.   The funds can be placed in what is termed a managed segregated account. I hope this answers your questions.
>
> Please feel free to contact me at any time. Be well.
>
> Michael Xirinachs"

51.     Subsequent to the October 27, 2006 Telephone Conference, another conference call was held in or about mid-November, 2006. This conference call included and was participated in by Livecchi, Rocco, Plaintiff, and another investor proposed to make a loan by Livecchi.

52.     In the course of this further "investment discussion", all of the statements, representations and assurances made in the course of the prior Emerald Loan Solicitations and in the course of the October 27, 2006 Conference Call were reiterated and confirmed by each of Livecchi and Rocco, in concert and acting for an on behalf of Emerald and Xirinachs, in response to continuing inquiries and requests for assurances from Plaintiff and the other prospective investor participating in this conference call.

53.     In addition, Livecchi and Rocco confirmed that all of the contracts for the TH Purchase Transaction were completed and that a closing on the initial buy side of the TH Transaction was anticipated to be consummated in December, 2006.

54.     Upon information and belief there was also a "Meet the Partners" meeting held at a hotel located on Long Island, in November, 2006 (the "Meet the Partners Meeting"). The purpose of  the Meet the Partners Meeting was to provide an opportunity for prospective investors to meet and greet the "partners" and "principals" in the TH Purchase Transaction, being Xirinachs, individually, and as General Partner of Emerald, and as the Managing Member of Emerald LLC, Advisors and Sand Stone, together with Livecchi and Rocco, and one or more other persons.

55.     Upon information and belief each of Xirinachs, Livecchi and Rocco, attended the Meet The Partners Meeting, and were available to, and did answer the questions of

prospective investors who attended that meeting; and each of them confirmed all of the foregoing representations identified above.

56.    Plaintiff did not physically attend the Meet the Partners Meeting, but attempted to participate therein by calling in on a tie-in conference line provided by Defendants for that purpose, while Plaintiff was physically located at his then apartment in New Jersey.

57.    Plaintiff remained on the telephone conference for the Meet The Partners Meeting only a short while because the quality of the phone line connection was poor. However, Plaintiff was able to discern that Xirinachs, Livecchi and Rocco were handing out Information Packages and other informational disseminations relating to and answering questions about the TH Purchase Transactions and the Emerald Loans, and was able to hear both statements being made by Defendants and questions being asked by prospective investors with respect to the TH Purchase Transaction and the making of the Emerald Loans.

58.    In reliance on the terms and assurances provided and made to Plaintiff in the foregoing discussions and exchanges with Xirinachs, Livecchi and Rocco, including and especially the continuing representations made in the course of the October 27, 2006 Conference Call, and by Xirinachs' October 30, 2006 e-mail to Plaintiff comprising the $5.5 Million Assurance, confirming: (i) that the proceeds of the Emerald Loans would be maintained in a segregated account in the name of Emerald at HSBC until applied to consummate the TH Purchase Transaction; (ii) that the Emerald Loans were guaranteed by a $5.5 million cash account in Emerald, representing Xirinachs' "equity stake" in Emerald or Advisors, segregated for the interest and benefit of the qualified investors who made Emerald Loans, and to be used to implement his guarantee of the Emerald Loans; (iii) the assurance that the repayment of the Emerald Loans was not contingent in any way on the closing of the TH

Purchase Transaction; and (iv) that the only thing contingent was the Back End Bonus, Plaintiff concluded that there was no appreciable economic risk or business risk with respect to making the Emerald Loans and/or purchasing the Promissory Notes, and/or purchasing limited partnership interests in Emerald, pursuant to the Subscription Agreement; and therefore he agreed to, and did subscribe for the Emerald Limited Partnership Interests

59.     To induce Plaintiff to execute and deliver the Subscription Agreement, Livecchi stated that despite the appearance that Plaintiff's subscription related to limited partnership interests in Emerald, this was just a mechanism used to create the basis for the creation of the segregated account which it was represented would be maintained at HSBC in the name of Emerald, which, upon opening and formation would hold the proceeds of the Emerald Loans until such funds were needed to fund the closing of the buy side of the TH Purchase Transaction.

60.     In pursuance of Plaintiff's investment decision, in or about late November, 2006, Livecchi provided Plaintiff with a Subscription Agreement for Emerald Capital Partners, LP, in the form annexed as Exhibit "D" hereto (the "Subscription Agreement").

61.     At the time that Livecchi proffered the Subscription Agreement to Plaintiff, neither he, Xirinachs, nor Rocco, nor anyone else on behalf of Emerald, provided Plaintiff with any of the other documents referred to in the Subscription Agreement, being the "Private Offering Memorandum" and the Emerald Limited Partnership Agreement.

62.     Notwithstanding the terms of the Subscription Agreement, at all times relevant herein, each of the individual Defendants on behalf of each of Emerald, Emerald LLC, Advisors and Sand Stone, represented and confirmed that Plaintiff was lending monies with accrued interest thereon, payable at the rate of 21%, compounded monthly, and that Plaintiff

21

was not making any equity investment in Emerald, or any other entity investment which would be subject to any type of market fluctuation or performance; and these representations were most specifically and graphically confirmed by the repeated representation that the proceeds of the Emerald Loans were to be held in a segregated account as HSBC.  Livecchi, in particular, stated that the Subscription Agreement should be viewed as nothing more than authority to open a segregated account by Emerald.

63.    Therefore, when Livecchi pressed Plaintiff to remit the loan proceeds quickly in late November and early to mid-December, 2006, for the stated reason that the TH Purchase Transaction was imminently about to close on the initial "buy side", and based on the further assurance that the loan proceeds were to be held in a segregated account until required to consummate the TH Purchase Transaction, Plaintiff embraced and complied with Livecchi's importunities.

64.    In the foregoing connection, Livecchi expressly advised Smoler to make his check payable to Emerald Asset Advisors, and to remit both the check and the signed Subscription Agreement to Advisors, at 425 Broad Hollow Road, Melville, New York 11747.

65.    Accordingly, Smoler remitted a check to Advisors, drawn on Ventures' account at Wachovia Bank, dated December 12, 2006, in the sum of $225,000.00, which was deposited by Defendants on December 21, 2006, upon the individual endorsement of Xirinachs.

66.    Upon information and belief, other investors also made Emerald Loans on substantially the same terms as Plaintiff, albeit at an 18% per annum interest rate, in late November and in December, 2006, and thereafter.

22

67.     Because in making the foregoing investment decision Plaintiff was motivated, in part, by the representations made just prior to December 12, 2006, to the effect that the closing of the buy side of the TH Purchase Transaction was imminently about to close, from and after that time and date Plaintiff made several inquiries of Livecchi as to the status of that closing.

68.     Although the TH closing continued to be delayed, no reasons for such delays were given at or before January, 2007; but rather Livecchi professed no specific knowledge, and fended off Smoler's inquiries with vague generalities.

69.     Specifically, Defendants failed and refused to disclose to Plaintiff and other lenders the true reasons that such closing was delayed.

70.     Upon information and belief the actual reason that the TH Purchase Transaction was not closed within the specified time frame of mid December, 2006 to early January, 2007, was due to, among other things: (a) the failure of Defendants to obtain the necessary and sufficient funding for the purchase of TH; (b) the concomitant failure and refusal of Xirinachs and Emerald to make good on their promise and representation that he or they would contribute any shortfalls; and (c) the failure and refusal of three or more States to provide counsel for Emerald and/or Sand Stone with a tax lien waiver regarding TH's operations and/or sales in those States.

71.     Defendants intentionally failed and refused to disclose that neither Emerald nor Xirinachs, individually, agreed to fulfill and adhere to their respective representations to make up any shortfall in the capital necessary to close the TH Purchase Transaction; and, in the first instance, failed to disclose to Plaintiff and other investors the issue relating to the tax lien waivers from at least three states.

23

72.   Thereafter, upon information and belief, based on complaints and inquiries from numerous other investor/lenders regarding the failure of the TH Purchase Transaction to close, Defendants were motivated and compelled to communicate with the investor/lenders on the Emerald Loans by a letter, dated January 19, 2007.  This January 19, 2007 letter was written and transmitted to Plaintiff and other investor/lenders on the letterhead of Advisors, and upon information and belief, was signed by Xirinachs as the Managing Member of Advisors. (A copy of the January 19, 2007 letter to "investors" is annexed as Exhibit "E" hereto).

73.   In substance, the January 19, 2007 letter stated that the "scheduled" closing for the purchase of TH was to take place on or about February 1, 2007.

74.   In recognition of the unexplained delay in closing, the January 19, 2007 letter indicated that the agreed upon and specified interest on the Emerald Loans would be paid to the investor/lenders commencing from and after January 1, 2007; although the TH Purchase Transaction would be closed subsequent to that date.

75.   Inconsistent with prior representations made to Plaintiff and, upon information and belief, other investor/lenders, and inconsistent with the express terms of the Subscription Agreement, the January 19, 2007 letter included with the following confirmation and representation:

> "Thank you for investing with Emerald Asset Advisors for the purchase of Tobacco Holdings, Inc. As we discussed, a separate company Sandstone Investment Partners, has been established through the Hedge Fund Emerald Asset Advisors for the specific purpose of purchasing Tobacco Holdings, Inc."

76.   Accordingly, this letter belied the prior representations that the investment was the purchase of Emerald Limited Partnership Interests, as a mechanism to make the Emerald

24

Loans, the proceeds of which would be held in a segregated account in the name of Emerald at HSBC, for use in consummating the TH Purchase Transaction.

77.    Upon information and belief, by his January 19, 2007 letter, Xirinachs intentionally misrepresented that "[t]he proceeds raised for the purchase were accumulated during the month of December 2006 and have been placed in a separate contribution account at HSBC for the sole purpose of the Tobacco Holdings purchase."

78.    Furthermore, it was the implicit, if not explicit, representation of the January 19, 2007 letter that funds sufficient to close on the buy side of the TH Purchase Transaction had been raised in December, 2006; and this representation was also intentionally and knowingly false and misleading.

79.    The representation that the loan proceeds from the Emerald Loans had been "placed in a separate contribution account at HSBC for the sole purpose of the Tobacco Holdings purchase" was also intentionally and knowingly false and misleading to the extent that, upon information and belief, as at January 19, 2007, those loan proceeds were, in whole or in part, removed from that account, to the extent they were ever deposited therein and such funds were commingled with other funds and/or used for the purpose of investment in securities which fluctuated with market performance and which were not therefore, a safe and secure investment.

80.    The January 19, 2007 letter went on to represent that the purchase of TH "is scheduled to take place on or about February 1, 2007.

81.    Upon information and belief, this representation that a closing was scheduled for on or about February 1, 2007, was also intentionally and knowingly false and misleading; and no such closing was, or could be, scheduled until final arrangements were made for the

25

contribution of sufficient additional capital to affect such a closing and until confirmation was received that the requisite tax lien waivers were obtained from the three Sates in question.

82.     Upon information and belief, no closing of any part of the TH Purchase Transaction was held on February 1, 2007; and there was no formal communication to the investors/holders of the Emerald Loans to explain the delay in consummating such closing at any time prior to July 11, 2007.

83.     In February, 2007, Plaintiff had made several inquires to Livecchi as to why the TH Purchase Transaction had not closed within the proposed February 1, 2007 time frame.

84.     Livecchi's response was that he did not know that Xirinachs was in Florida, and he could not be contacted.  He did, however, confirm that Xirinachs was engaged in negotiating for a reduction in the purchase price for the initial buy side in the TH Purchase Transaction, but Livecchi failed and/or refused to provide any specific details in that connection.

85.     In or about mid February, 2007, after confirming that a reduced purchase price had been negotiated by Xirinachs for the purchase of TH, as agreed to by the seller of TH, Livecchi confirmed to Plaintiff that the only remaining delay related to the manner in which Xirinachs was going to raise the short fall between the amount then contributed in Emerald Loans and the amount needed to close on the purchase of TH from the owner.

86.     In substance, Livecchi assured Plaintiff that the deal was at this time better than ever--given the lower purchase price and the substantive progress made to increase monthly the cigarette carton production to achieve the 400,000 per month carton requirement, as expressly confirmed in Xirinachs' letter of January 19, 2007.

87.     In response to Livecchi's indication that he and Xirinachs were still pursuing additional Emerald Loans, Smoler stated to Livecchi that he had some additional capital available to increase the amount of his Emerald Loans.

88.     Livecchi told him the contribution of such additional funds at that time was even better than the initial investment, and any additional loan proceeds would be secured in the same manner as the initial investment.

89.     Accordingly, based on the prior representations and assurances of Defendants, the assurances and representations of the January 19, 2007 letter, and Plaintiff's discussions with Livecchi in February, 2007, to the effect that the closing was now even more imminent, and dependant only on receiving some additional loan proceeds, and the express implication that any additional loan proceeds would be similarly deposited and held in a segregated account at HSBC, in mid February, 2007, at the urging of Livecchi, Plaintiff agreed to invest an additional $40,000.00 through Ventures and $60,324.26 of his "401K money" by the additional purchase of Emerald Loans. Accordingly, in pursuance of the instructions provided by Livecchi, checks were drawn by Plaintiff and made payable and remitted to Advisors in the respective amounts of $40,000.00, and $60,324.26, each dated February 12, 2007.

90.     Upon this additional investment, Plaintiff's aggregate purchase of Emerald Loans/Notes and/or the purchase of Emerald Limited Partnership Interests aggregated $325,324.26. The $40,000.00 check from Ventures was deposited by Defendants on February 28, 2008, upon the individual endorsement of Xirinachs.

91.     In advance of this submission Livecchi had transmitted new Subscription Agreements to Plaintiff, and urged that the checks and the Subscription Agreements be remitted to Livecchi, or directly to Advisors, as soon as possible in anticipation of an imminent closing on the TH Purchase Transaction.

92.     As was the case upon the first investment, none of Xirinachs, Livecchi, or Rocco provided Plaintiff with any copy of the Private Offering Memorandum and/or Limited Partnership Agreement referenced in the Subscription Agreement.

93.     Nonetheless, Plaintiff continued to rely on the assurances of the Defendants that such additional loan proceeds, like the prior loan proceeds, would be deposited in a segregated account at HSBC, and would be held and used for the sole purpose of closing on the TH Purchase Transaction; or not at all for any other purpose.

94.     Notwithstanding this investment remittances, Plaintiff never received the issuance of any Promissory Note, or a Purchase Agreement with respect to the Promissory Note; never received a countersigned Subscription Agreement, or any other confirmation of the receipt of his loan proceeds in the aggregate sum of $325,324.26; and did not receive any other writing recounting the terms of the foregoing investment, including as to the Back End Bonus; except that Plaintiff did thereafter receive quarterly statements on Advisors letterhead confirming the principal amount of Plaintiff's two investments and the accrual of interest at the rate of 21% per annum, compounded monthly, with the option to pay the interest accrued quarterly, or continue to roll the accrued interest and principal for a greater amount of compound interest.  Examples of such monthly statements confirming both Plaintiff's initial and subsequent investment of loan capital are collectively annexed hereto collectively as Exhibit "F".

95.     On or about March 9, 2007, Plaintiff was advised by Livecchi that the closing of initial buy side of the TH Transaction would be delayed for yet another few months.  This information was disconcerting to Plaintiff since Smoler was previously advised by Livecchi in early February, 2007 that the TH Purchase Transaction was then imminently about to close, which induced Plaintiff to make additional Emerald Loans.

96.     More specifically, in mid-February, 2007, Livecchi advised Smoler that Xirinachs had expressly authorized him to report to Plaintiff and the other investors that Xirinachs was then "meeting with the lawyers for the specific purpose of closing the deal".

97.    At March 9, 2007, for the first time, Livecchi informed Plaintiff that Xirinachs had been unable to obtain lien waivers from three or more States regarding taxes or liens that such states might have against TH; and that Xirinachs was claiming that in the exercise of his fiduciary duty to Emerald, it was improvident to close on the TH Purchase Transaction until such lien waivers were obtained.

98.    Upon information and belief, this was interposed as a convenient excuse for the nondisclosure of such material information at a prior time.

99.    Becoming dubious of the rationale being proffered by Livecchi, Plaintiff rhetorically and in tongue-in-cheek manner, posited his view to Livecchi that "one does not go to a closing only to first learn upon arrival that the various States have still not agreed to provide lien waivers".

100.   From this exchange, Plaintiff first appreciated the reality that the repeated representations from Xirinachs and Livecchi, including in the course of the October 31, 2006 Conference Call, that the closing of the TH Purchase Transaction was imminent, were intentionally false and misleading; and were falsely orchestrated to create and apply pressure on Plaintiff and others to induce investors to make or enlarge their the Emerald Loans.

101.   Upon information and belief, Xirinachs, Livecchi and Rocco continued to make the Emerald Loan Solicitations in December, 2006, and in January, February and March, 2007 in an effort to raise sufficient loan proceeds to fund the TH Purchase Transaction; and Defendants continued to receive loan proceeds during each of those months.

102.   Although upset that he was deceived, Smoler advised Livecchi that he was not presently concerned about the security of Plaintiff's investment, based on the assurances that such proceeds had been deposited in, and were then currently being held in a segregated account

29

at HSBC, with interest accruing thereon from January 1, 2007. Livecchi confirmed this fact and circumstance.

103. Plaintiff then charged Livecchi to ascertain the actual facts of the investment, and to provide him with a true and accurate recital of the status of the TH Purchase Transaction, the Emerald Loans, and all of the underlying facts and circumstances.

104. In response to Smoler's demand for a full disclosure, Livecchi admitted the following, among other things: (i) most of delay in closing was attributable to him, as he was asking Xirinachs for more time to raise additional capital, so that he could earn a greater share and portion of any profits to be derived upon the sale of TH; (ii) the bulk of the investors' money was taken in by Defendants in December, 2006 and January, 2007, with residual deposits still being solicited and being received as late as March, 2007. However, Livecchi did note that new lenders, making Emerald Loans in March, 2007, or thereafter, would receive a less advantageous economic deal for making such loans, as compared to prior investors; although he did not state or disclose those terms; (iii) Interest on the Emerald Loans started accruing on January 1, 2007 for the monies collected in December, 2006; (iv) by the beginning of January, 2007, it was apparent that the TH Purchase Transaction would not close in the first few days of that month, so a letter went out to the investors informing them of a delay in the anticipated closing, in response to complaints about a lack of communication from the Defendants—it being admitted by Livecchi that the delay was due to insufficient loans having been made to allow Defendants to be able to fund the consummation of the TH Purchase Transaction; (v) when the closing still did not occur as at February 1, 2007, that again was due to insufficient capital funding, and disagreements regarding the back end percentages among Xirinachs, Livecchi and Rocco; (vi) "disclosure of these facts had not been made to any Investors; and I mean no one knows about these issues other than you"; (vii) If Livecchi had raised all the money required, there would not have had

30

been a renegotiation of the back end percentages among Xirinachs, Livecchi, Rocco and one or more others; (viii) The investors did not need to know what deal he [Livecchi] had on the back end, nor do they need to know that I [Livecchi] was renegotiating it"; (ix)  Xirinachs did indeed renegotiate down the purchase price for the TH Purchase Transaction for the reason that the lawyers uncovered that three states had not been able to provide lien waivers, as was discerned during the due diligence process; (x) Initially Defendants thought that they needed $ 4 million to purchase TH from its owner. However,  ultimately it was discerned that they required only approximately $3.3 million--of which Livecchi stated he raised $1.5 million, Xirinachs put in $.5 million, and Rocco and Carl Nappi (also a partner in the TH Purchase Transaction) were working out the details for acquiring the balance of the funds needed to close on the TH Purchase; and (xi) "If I mislead you, I apologize, but believe me when I say I was relaying information and updates provided to me from Xirinachs, without any ... embellishment, which he told me to relate to the investors".

105.   Upon information and belief, Defendants knew as at or prior to February 1, 2007, and in all events prior to February 13, 2007, that three states did not and would not issue tax and lien waivers as to TH sales and operations in those states, but failed and refused to disclose that information to Plaintiff and other investors investing on or after February 13, 2007, or at any time before July 11, 2007.

106.   For obvious reasons, Livecchi declined to provide these answers to Plaintiff in any correspondence and elected to transmit this information by e-mail only.

107.   In or about April or May, 2007, Livecchi advised Plaintiff that Xirinachs advised him that Xirinachs was willing to give Plaintiff the option of terminating its Emerald Loans, with all appropriate interest being paid to the date of Plaintiff's withdrawal of its loan

31

capital. Livecchi advised Plaintiff that Xirinachs was willing to speak with him directly on this arrangement.

108. Thereafter, as at June 15, 2007 Livecchi advised Plaintiff that the TH Purchase Transaction was funded 100%.

109. During and through this entire period no Promissory Note and no Note Repurchase Agreement, including in the forms of Exhibits "B" and "C" hereto, were ever executed; nor was Plaintiff provided with any other confirmation or manifestation of any loan, investment or purchase of securities, except for the quarterly statements of account annexed as Exhibit "F".

110. Xirinachs again wrote to Plaintiff and, upon information and belief, to other investors, by a letter prepared and issue on Advisors letterhead, dated July 11, 2007, which was executed by Xirinachs as "General Partner" (sic), managing member of Advisors. (A copy of Xirinachs letter of July 11, 2007 is annexed hereto as Exhibit "G")

111. The July 11, 2007 letter purported to forward Plaintiff's quarterly interest check, but it was not enclosed, together with a statement of the account; and in the second paragraph thereof, stated the following:

> "Once again I find it necessary to communicate with each of you the purchasing delay of Tobacco Holdings by Sandstone Partners. Once again, the reason for the delay is the painstaking process of dealing with government agencies. Once again, the deal is fully funded and ready to close. Once again we wait for the bureaucracy."

112. This July 11, 2007 letter was also intentionally false and misleading, for the reason, among others, that it attempts to make it appear that Defendants had repeatedly and previously disclosed that the closing of the TH Transaction had been delayed due to the inability and/or refusal of at least three states to issue necessary tax lien waivers for TH.

32

113.   In fact, no such disclosures were made to Plaintiff at any time prior to March 9, 2007; and upon information and belief such disclosures were made for the first time to all investors by this July 11, 2007 letter.

114.   Xirinachs' July 11, 2007 letter concluded with the following confirmation and assurance:

> "Your principal investment, interest and back-end bonus will not be compromised and we thank you for understanding the detainment. As always, feel free to contact either John [Livecchi] or me at any time."

115.   By a similar letter, dated October 1, 2007 (a copy of which is annexed hereto as Exhibit "H"), Xirinachs announced that the drop date deadline for receiving those tax lien waivers from the subject states was November 30, 2007; stating that:

> "If we cannot agree on a solution by that date, we will end our pursuit of Tobacco Holdings. At that time, the investors will receive their principal and appropriate interest."

116.   Thereafter, despite assurances in June, 2007 that Defendants had obtained the full funding needed to consummate the TH Purchase Transaction, final notification that the TH Purchase Transaction was cancelled was communicated by a December 10, 2007 letter from Xirinachs, also written on Advisors' letterhead, and signed by Xirinachs in the capacity of General Partner (sic) managing member.   That letter further confirmed that Plaintiff's loan moneys would be repaid in mid-January, 2008. (A copy of that letter is annexed hereto as Exhibit "I")

117.   Xirinachs' December 10, 2007 stated as follows:

> "During the course of the next few weeks I will unwind the Sandstone Partner interest in purchasing Tobacco Holdings and refund the principal and appropriate interest as of November 30, 2007 to the investors.  If you have specific instructions as to where the money should be sent, please contract John

[Livecchi] with the wire or mailing details. The refunding should occur in mid January 2008"

118.    This was an admission that that the representation that the proceeds from the Emerald Loans would be held and maintained in a segregated account at HSBC, and the subsequent written confirmation of that fact by Xirinachs, were both intentionally false and misleading.

119.    In response to Xirinachs' December 10, 2007 letter, Plaintiff provided Livecchi with a written advisement of the wire transfer instructions for the repayment of his loans and all accrued interest thereon.

120.    However, no such repayment was forthcoming in favor of Plaintiff.

121.    As at May 6, 2008, Plaintiff notified Xirinachs by e-mail transmitted that date that the repayment of Plaintiff's Emerald Loan, principal and interest, were substantially overdue—reiterating his agreement with Xirinachs to the effect that Plaintiff's funds would remain on account in cash until the closing of the TH Purchase Transaction.

122.    Accordingly, by his May 6, 2008 e-mail, Plaintiff demanded that Xirinachs forward all payments of principal and interest by wire transfer not later than May 15, 2008; and he enclosed written wire transfer instructions.

123.    In response to Plaintiff's e-mail of May 6, 2008, by his responsive e-mail, transmitted that same day, Xirinachs confirmed the following:

"As I have stated to the Tobacco Holdings investors many times, it is clearly NOT my intention not to pay off the investors of TH. On the contrary, I will in fact pay all of the investors all of their principal as well as interest owed. The situation has always been that monies were invested in non-public companies and unwinding certain transactions does take time. To date most of the investors have received their funds back and I continue to liquidate positions to cover the balance owed. If you have any questions regarding the return of your funds

34

please feel free to call me. I can assure you that I am doing everything possible to unwind transactions as quickly as possible."

124.  Upon information and belief, the statement by Xirinachs to the effect that most investors had been repaid was intentionally false when made, and was made to induce Plaintiff to more patiently await repayment, if at all.

125.  Upon information and belief, at the date of this representation only a few small investors had been repaid, and there remained unpaid approximately $1,262,000.00 out of a total amount of Emerald Loans of $1,550,000.00.

126.  Xirinachs' May 6, 2008 e-mail was directly contradictory to the representations of Xirinachs' and the other Defendants made in the course of the October 27, 2006 Conference call and Xirinachs' October 30, 2006 e-mail to Smoler and the January 19, 2007 letter, to the effect that all loan proceeds would be and were being held in a segregated account at HSBC; and or that Xirinachs had segregated %5.5 million in funds within Emerald and/or Advisors to guarantee the repayment of the Emerald Loans.

127.  On May 13, 2008, Xirinachs advised Plaintiff that he would have a more definitive time line for repayment by Monday, May 19, 2008; and committed to contact Plaintiff on that date with more details.

128.  Xirinachs did not respond to Plaintiff on Monday, May 19, 2008.

129.  Instead, on May 22, 2008, responding to Plaintiff's e-mail transmitted to Xirinachs on that date, which expressed Plaintiff's expectation that Xirinachs should have gotten back to him by that date with specific payment information, Xirinachs apologized for the delay in getting back to Plaintiff, and advised him that he was trying to "nail down a definitive date for repayment", while admitting that it was "impossible to commit to a

particular date"; but nonetheless offered and committed to payment schedule as follows: week of June 15th--$100,000.00; week of July 6th--$100,000.00; week of July 27th--$100,000.00; week of August 4th—Balance" (the "Payout Schedule").

130.    Upon information and belief, on the date this offer for an agreed upon Payout Schedule was made, the outstanding balance due to Plaintiff for principal and interest on account of his Emerald Loans was something in excess of $390,024.28.

131.    By e-mail, dated May 23, 2008, Plaintiff wrote to Xirinachs with a copy to Livecchi, accepting the offer for the Payout Schedule; and requested that all funds in pursuance of the Payout Schedule be remitted to his accounts in accordance with the wire transfer instructions previously provided by Plaintiff to Livecchi in response to Xirinachs' letter of December 10, 2007.

132.    Smoler admonished Xirinachs that he would monitor all payments to Plaintiff's accounts from Singapore; and, based on this agreed upon Payout Schedule, committed to hold off his attorney from further action.

133.    The first payment required to be made pursuant to Payout Schedule was $100,000.00, to be paid during the week of June 15, 2008. That payment was not made; and Defendant Xirinachs and Emerald were thereby in breach and default of the repayment agreement.

134.    On June 24, 2008, Xirinachs wrote to Plaintiff by an e-mail transmitted on that date, claiming that the wire transfer representing the first payment under the Payout Schedule was not sent as per Plaintiff's wire transfer instructions because an escrow check did not clear. Xirinachs further represented that he was working on another source of funds to satisfy this payment requirement, but provided no further specification.

135.    By his further e-mail transmitted on June 27, 2008 to Bruce Smoler, the brother and attorney for Smoler, Xirinachs further admitted that the wire transfer to pay the first installment to Smoler under the Payout Schedule could not be processed because the moneys to pay that amount did not clear the account in which they were held.  He further admitted that while this is not what he agreed to with Plaintiff, it was out of his control; but nonetheless stated that he expected that the problem will be resolved shortly and that the funds will be sent as discussed.

136.    Notably, these statements and claims are in contravention of, among other representations, Defendants' express representations that: (a) the proceeds from the Emerald Loans would be held in a segregated account maintained by Emerald at HSBC Bank until needed to consummate the TH Purchase Transaction; and (b) Xirinachs' express representation that he would maintain a $5.5 million fund in USD, segregated within Emerald's funds to guaranty the  repayment all Emerald Loans, principal and interest; and belies the truth and efficacy of those express representations—each and all of which Plaintiff relied on in making the Emerald Loan in the aggregate sum of $325,324.46; and but for which he would not have made such loans.

137.    In furtherance of the claim that these statements by Xirinachs were misrepresentations by Xirinachs and Defendants, Bruce Smoler writing to Xirinachs as Plaintiff's attorney, by his July 1, 2008 e-mail to Xirinachs, observed that in Xirinachs' June 26, 2008 e-mail to Plaintiff, Xirinachs did not provide a new date for the first and succeeding payments of the Payout Schedule, and he failed to make any commitment as to a time table for full and complete payment.

138.    Responding to Bruce Smoler's July 1, 2008 e-mail to him, Xirinachs by his own e-mail of July 1, 2008, reiterated that:

> "As I stated it is not a question of whether he [Andrew Smoler] will be paid back it is simply the timing of such."    "... I am unwinding a number of investments and thought the monies would become available as I mentioned in my e-mail to him [Andrew Smoler].  Unfortunately, with the markets in a severe downturn it has taken longer than anticipated."

139.    No further agreement or accommodations were reached or consummated; and Emerald and Xirinachs were then in and continued to be in breach and default of the repayment of the Plaintiff's Emerald Loans, and the separate agreement to make payment in accordance with the Payout Schedule; and such breach and default continued despite demand for payment.

140.    Upon information and belief, the proceeds of the Emerald Loans were deposited into and commingled with the general funds of Emerald, Emerald LLC, Advisors, Sand Stone, and/or other entities controlled by Xirinachs, contrary to the express representations of Defendants, and each of them to the contrary.

141.    At no time did Xirinachs or any of the other Defendants disclose to Plaintiff that the proceeds from the Emerald Loans would be commingled with the general investments and investment funds of the foregoing entities.

142.    To the contrary, at all times Defendants represented that such funds would be held and maintained in a segregated escrow account at HSBC until needed to consummate the TH Purchase Transaction.

143.    At no time did Xirinachs or any of the other Defendants, disclose that the proceeds from the Emerald Loans would be illiquid, and not capable of being repaid when due, or earlier upon written demand made not sooner than on three months written demand, made at

38

any time from and after twelve (12) months after the date of the Emerald Loan, or otherwise if the TH Purchase Transaction was terminated.

144.    At no time did Xirinachs, or any of the other Defendants disclose that the proceeds from the Emerald Loans would be used for a purpose other than with respect to consummating the TH Purchase Transaction; although they had a fiduciary duty and obligation to disclose that fact and circumstance.

145.    At no time did Defendants disclose to Plaintiff that both Xirinachs and Emerald failed and refused to short fall between the amount of the Emerald Loans raised from qualified private investors and the amount required by contract for the purchase of TH.

146.    Upon information and belief, pursuant to the Subscription Agreement, the Emerald Loans were applied to Plaintiff's purchase of limited partnership interests in Emerald; and such funds, in the control of Emerald and/or Xirinachs, were used to purchase interests in various non-public companies—thereby making those funds and investments illiquid, and not available to be repaid to Plaintiff on a timely and required basis; as to which events and circumstances Defendants failed to make any good faith disclosure; and failed to disclose facts which were material and which were required to be disclosed to make the prior representations made by Plaintiff true under the circumstances.

147.    At no time did Defendants ever disclose that Sand Stone had different investors as compared to Emerald, and was not wholly owned by Emerald.

148.    Upon information and belief, in addition to the foregoing intentionally false and misleading representations, Defendants, including John Does 1 through 5, working in concert and in collusion, and conspiring with each other to induce Plaintiff to make the Emerald Loans and/or mistakenly to invest in and purchase limited partnership interests in Emerald, did also

and further engage in actions and conduct which were and was intended to confuse and mislead Plaintiff, and one or more others, including by interchangeably referring to Emerald, Emerald LLC and Advisors as being interchangeable, and by using the proceeds of the Emerald Loans to invest in various other securities, which investments were illiquid and improvident and otherwise inappropriate for trust funds, and thereby mislead Plaintiff and falsely induced Plaintiff to purchase the Emerald Limited Partnership Interests.

149.   The foregoing appears from the following additional facts and circumstances:

(a)   The Information Package says it was prepared by Emerald Capital Partners, LP;

(b)   The Subscription Agreement provided for the purchase of a limited partnership interest in Emerald Capital Partners, LP;

(c)   The Information Packages says that Emerald Capital Partners, LP will guarantee the repayment of the note;

(d)   In comparison, the Promissory Note and the guarantee contemplated therein and the Note Purchase Agreement (Exhibits "B" and "C", refer to and contemplate that the payor and guarantor under the Note is Emerald Capital Partners, LLC;

(e)   All of the letters from Xirinachs are on Emerald Asset Advisors, LLC letter head and he signs as general partner, when he is, in fact, the managing member of Advisors;

(f)   While the Subscription Agreements provide for a putative investment in Emerald, as a limited partner, the January 19, 2007 letter from Xirinachs, on Emerald Asset Advisors letterhead states:

"Thank you for investing with Emerald Asset Advisors for the purchase of Tobacco Holdings, Inc. As we discussed, a separate company Sandstone Investment Partners, has been established through the Hedge Fund Emerald Asset Advisors for the specific purpose of purchasing Tobacco Holdings, Inc.";

(g)   Plaintiff was advised to make his investment checks are payable to Emerald Asset Advisors;

(h)   The quarterly statements issued to Plaintiff confirming the payment of interest on his invested principal are on the letterhead of Emerald Asset Advisors; and

(i)     Upon information and belief, when and because Xirinachs, Emerald, Emerald LLC and/or Advisors needed additional monies to pay the accrued interest on the Emerald Loans, Xirinachs caused the trust fund and escrow monies supposedly held in a segregated account at HSBC to be invested, including through Emerald and/or Advisors or Sand Stone, in the securities of other companies, which investments were illiquid, improvident, and in all circumstances improper with respect to funds held as trust funds, subject to the fiduciary duty of one or more of the Defendants.

150.    In response to Plaintiff's inquiry concerning these inconsistencies, Livecchi stated that the entities were all controlled by Xirinachs, and were interchangeable.

## COUNT I

### AGAINST ALL DEFENDANTS FOR FEDERAL SECURITIES FRAUD IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER

151.    Plaintiff repeats the allegations made in paragraphs "1" through "150" of this Complaint.

152.    By reason of the acts, material omissions, and misrepresentations of fact alleged in this complaint, and by reason of Plaintiff's reliance on such representations in making the investment herein described, Defendants are liable to plaintiffs for Federal Securities Fraud in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

153.    By way of reiteration and clarity, and for the absence of doubt, Defendants, individually, and in concert, intentionally misrepresented each of the following material facts and circumstances, and/or failed and omitted to make disclosures of material facts necessary to make the representations made by them true under the circumstances made:

(a)     That Plaintiff's investment was to be a loan to Emerald, which would bear interest at the rate of 21% per annum, compounded monthly, with interest running from the date the loan was made until it was fully repaid in full as to principle and interest. In fact, at the time the monies were to be remitted, Defendants instructed Plaintiff to remit his funds to Advisors, not Emerald;

(b)     In fact, Plaintiff's investment was, without his knowledge or consent, converted to the purchase of limited partnership interests in Emerald;

41

(c)     That Emerald, through a wholly owned subsidiary company, Sand Stone, would consummate the TH Purchase Transaction. However, subsequent to Plaintiff's investment, Xirinachs and Advisors advised Plaintiff, and other investors in the Emerald Loans that the TH Purchase Transaction was to be consummated by Advisors, through a separate company formed for that purpose, Sandstone Investment Partners;

(d)     In the forgoing connection, Defendants failed to disclose to Plaintiff and the other investors in the Emerald Loans, that the owners of Sand Stone were different from the Owners of Emerald, and that Plaintiff's monies would be commingled with Sandstone investment funds, or that it would be commingled in other investments;

(e)     That the terms of the Emerald Loans would require a commitment of loan capital for up to twenty four (24) months from the date of the loan, with a minimum of fifteen (15) months as the "Initial Lending Period", and that even if there was a capital withdrawal after the Initial Lending Period on due and written notice, Plaintiff and the other investors would retain the right to receive the Back End Bonus;

(f)     That Emerald would receive and utilize all proceeds from the private loan transactions for the sole purpose of funding the purchase and expansion of TH; and that from and after receipt of those funds and pending the application of those loan proceeds for and with respect to the TH Purchase Transaction, such loan proceeds would be placed and held in a separate escrow fund maintained by Emerald at HSBC Bank for the sole purpose of the Tobacco Holdings, purchase;

(g)     That a closing on the buy side of the TH Purchase Transaction was imminently about to close in early January and/or February, 2007;

(h)     That the Promissory Notes were to be issued by Emerald to evidence the Emerald Loans and that Emerald and Xirinachs would fully guaranty the repayment of all of the principal and interest accruing on the Emerald Loans; but subsequently, it was represented that Promissory Notes and a Note Purchase Agreement would be issued by Advisors, and that Advisors would fully guaranty the repayment of all Emerald Loans;

42

(i)     That funding for the TH Purchase Transaction through the Emerald Loans would be finalized sometime mid to late November or early December, 2006;

(j)     In the event that there was a shortfall in raising sufficient funds for the TH Purchase Transaction, Xirinachs and/or Emerald would fund any such shortfall;

(k)     The Emerald Loans constituted a "can't lose" "once in a life time" opportunity, in that the Emerald Loans were being guaranteed by both Emerald and Xirinachs, and because the Emerald Loan proceeds would be deposited in a separate "escrow account" at HSBC Bank, and held for the sole purpose of consummating the TH Purchase Transaction; but, in fact, such loan proceeds were commingled with other fund and invested in other investments unrelated to the TH Purchase Transaction and thereby became illiquid;

(l)     That to further support that guarantee, Xirinachs represented that his equity stake in Emerald, at October 31, 2006 was $5.5 million and would beheld in a cash position USD throughout the term of the Emerald Loan, segregated and pledged for the purpose of such guarantee, and would not put at risk throughout the term of the Emerald Loan, so that they would not be subject to any other call;

(m)     That Emerald, Emerald LLC and Advisors were all the same entities and that as controlled by Xirinachs they were interchangeable;

(n)     Defendants failed and refused to disclose to Plaintiff and other lenders the true reasons that such closing was delayed; in that Defendants failed to disclose the problems and deficiencies in obtaining full funding; and Defendants failed to timely and/or fully disclose the facts and circumstances regarding the failure and refusal of approximately three states to issue tax liens regarding TH sales and operations in those states;

(o)     That Xirinachs, Livecchi and Rocco were to receive more than twenty million dollars in the event that TH was sold for more than $60 million;

(p)     That Xirinachs would repay the Emerald Loans in January, 2008;

(q)     That as at May 6, 2008, "most of the investors [had] received their funds back"; when, in fact, at that date only a few small investors had been repaid, and there remained

unpaid approximately $1,262,000.00 out of a total amount of Emerald Loans of $1,550,000.00; and

(r)     That as at July 11, 2008, Xirinachs was unwinding various investments for the purpose of paying the Emerald Loans of Plaintiff and other investors;

154.   As a result of, and in reasonable reliance on Defendants' representations, Plaintiff's remitted checks in the respective sums of $225,000.00, $40,000 and $60,324.46 for an aggregate investment in the purchase of securities of $325,324.46.

155.   Because Defendants misrepresented the true facts underlying the sale of the Emerald Notes and/or the Emerald Limited Partnership Interests, and because Defendants failed and omitted to disclose material facts in that connection, Plaintiff is entitled to recover the foregoing sums from Defendants, jointly and severally, together with interest thereon at the agreed rate of 21% per annum, compounded monthly, together with such other and further relief as is just and proper, including an award of all of plaintiff's attorneys' fees, and punitive damages, as may be determined at trial, but in an amount that is not less than three times the aggregate amount of Plaintiff's compensatory damages hereunder.

## COUNT II

### AGAINST XIRINACHS PURSUANT TO SECTION 20(a) OF THE EXCHANGE ACT

156.   Plaintiff repeats the allegations made in paragraphs "1" through "150" and "152" "155" of this Complaint.

157.   By reason of his status as a controlling person in respect of Emerald, Emerald LLC, Advisors and Sand Stone, Xirinachs is liable to Plaintiff for Emerald's, Emerald LLC's, Advisor's and Sand Stone's primary violations of Section 10(b) of the Exchange Act, and of Rule 10b-5 promulgated thereunder, pursuant to Section 20(a) of the Exchange Act, as well as for his own primary violations thereof.

158.   By reason of the foregoing, Plaintiff is entitled to a judgment against Xirinachs for damages in the principal amount of $325,324.46, together with interest thereon at the rate

of 21% per annum, compounded monthly, from and after the respective dates of Plaintiff's remittance payments in the sums of $225,000.00, $40,000.00 and 60,324.46 respectively; and Plaintiff is entitled to recover the foregoing sums from Defendants, jointly and severally, together with such other and further relief as is just and proper, including an award of plaintiff's attorneys' fees, and punitive damages as may be determined at trial.

**COUNT III**

**AGAINST ALL DEFENDANTS FOR
COMMON LAW FRAUD**

159.   Plaintiff repeats the allegations made in paragraphs "1" through "150" and "152" through "158" of this Complaint.

160.   Defendants knowingly and intentionally misrepresented and concealed from Plaintiff material facts underlying the TH Purchase Transaction.

161.   Plaintiff reasonably relied on the representations of Defendants in making the Emerald Loans and/or in purchasing the Emerald Limited Partnership Interests, and suffered damages as a result of Defendants' misrepresentations and omissions to disclose material facts.

162.   In and with respect to the misrepresentations of Defendants, the Defendants and all of them, colluded and acted in concert in deceiving and inducing Plaintiff to make the Emerald Loans and in respect of purchasing the Emerald Limited Partnership Interests; and by reason of the untruthfulness, inaccuracy and incompleteness of Defendants' representations, and by reason of Defendants' omissions, Defendants are liable to Plaintiff, jointly and severally, for common law fraud.

163.   By reason of defendants' fraudulent misrepresentations, Plaintiff is entitled to a judgment against Defendants, jointly and severally, for damages in the principal amount of $325,324.46, together with interest thereon at the rate of 21% per annum, compounded monthly, from and after the respective dates of Plaintiff's remittances of said monies, together with such other and further relief as is just and proper, including an award of the costs and disbursements of this action, and an award of punitive damages in an amount to be determined

at trial, but in an amount which is not less than three times the amount of Plaintiff's investment as described herein, plus the legal fees and costs incurred by Plaintiff in this action imposed as part of the measure of punitive damages hereunder.

**COUNT IV**

**AGAINST ALL DEFENDANTS FOR
NEGLIGENT MISREPRESENTATION**

164.   Plaintiff repeats the allegations made in paragraphs "1" through "150", "157" through "158" and "160" through "163" of this Complaint.

165.   At all relevant times, Defendants had superior knowledge concerning the fact that Emerald, Emerald LLC and/or Advisors would not and could not practically hold the proceeds of Plaintiff's Emerald Loans and those of the other investors, and other funding or financing made in contemplation of the TH Purchase Transaction, in a segregated account and/or a cash position (USD) throughout the term of the Emerald Loans, to be maintained at HSBC in the name, and or for the account of Emerald or Advisors, otherwise as to the "equity stake" of Xirinachs in Emerald or Advisors, for the account Plaintiff and/or the other investor/lenders.

166.   At all relevant times, Defendants had superior knowledge concerning the fact that Xirinachs would not and could not practically maintain his "equity stake" in Emerald in a segregated account within Emerald, in a cash position (USD), throughout the term of the Emerald Loans, or the term of any notes issued to Plaintiff to evidence such Loans, in a manner so as to fully secure the repayment of the Emerald Loans, and so that such $5.5 million (USD) equity stake was pledged to secure that guaranty obligation, and so that it could not be invaded in any manner or way by any third parties.

167.   At all relevant times, Defendants had superior knowledge that such funds would not and could not practically be held by Emerald so that there was no risk that such funds would be not be invaded throughout the term of such Emerald Loans by Plaintiff, and/or any Promissory Note issued to secure or evidence such Loans.

46

168.   At all relevant times, Defendants had superior knowledge that such funds were not held in a secure segregated account and had be moved or transferred in form to be invested in the securities of other companies—to the extent they were ever deposited in such a segregated account at HSBC.

169.   At all relevant times, Defendants had superior knowledge that it was not true or accurate to represent that if the Emerald Fund "blew up" (had its asset base substantially diminished or compromised), third party creditors could not reach the segregated funds of Plaintiff and other lenders; and it was not true that such funds were pledged and maintained as collateral against Xirinachs' guarantee, so that they could never be used to satisfy any claims by third parties.

170.   At all relevant times, Defendants had superior knowledge concerning the fact that when Xirinachs represented that his $5.5 million in funds would be placed and held in what he termed "a managed segregated account", that actually referred to and meant that such funds could be invested, would be at "risk", would fluctuate with the performance of the Emerald Fund, and that such funds would be illiquid and not readily available to provide collateral to support his guarantee of the repayment of Plaintiff's Emerald Loans, principal and interest.

171.   In light of the foregoing, in making the foregoing representations to Plaintiff, Defendants had a fiduciary and other duty to exercise reasonable care so as to ensure that their representations to Plaintiffs as to the guarantee of repayment of Plaintiff's Emerald Loans were not materially false and misleading; and they had a fiduciary duty to disclose to Plaintiff and the other lenders making the Emerald Loans all of the underlying material facts and circumstances concerning the TH Purchase Transaction and the sale of the Emerald Loans and/or the Emerald Limited Partnership Interests, but failed to disclose such facts and circumstances and, in fact, intentionally secreted them.

172.   By reason of the acts complained of in this complaint, Defendants breached their respective fiduciary and other duties, and are liable, jointly and severally, to Plaintiffs for negligent misrepresentations.

173.   By reason of Defendants' negligent misrepresentations, Plaintiff is entitled to a judgment against Defendants, jointly and severally, for damages in the principal amount of $325,324.46, together with interest thereon at the rate of 21% per annum, compounded monthly, together with such other and further relief as is just and proper, including an award of the costs and disbursements of this action.

COUNT V

**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY**

174.   Plaintiff repeats the allegations made in paragraphs "1" through "150", "160" through "163" and "165" through "173" of this Complaint.

175.   Each of Emerald, Emerald LLC, Advisors and Xirinachs, and Livecchi and Rocco, and John Does 1 through 5, as agents for Emerald, Emerald LLC, Advisors, and as persons working in concert and in complicity with such persons, and Xirinachs, as the General Partner and/or Managing Member of Emerald, Emerald LLC, Advisors and Sand Stone, respectively, owed a fiduciary duty to Plaintiff to receive and hold the proceeds from Plaintiff's Emerald Loans as trustees, in a segregated escrow cash account at HSBC; and/or not to put those funds at risk, and to utilize and apply those funds solely to consummate the TH Purchase Transaction.

176.   In failing to take all appropriate actions to segregate, maintain and protect from risk of loss and illiquidity the proceeds of Plaintiff's Emerald Loans, and in failing to ensure that such funds were utilized solely and exclusively for the purposes contemplated in connection with the consummation of the initial purchase of TH from the owner thereof, and in failing to disclose known facts to the contrary to Plaintiff, Defendants, and each of them, breached their individual and collective fiduciary duty to Plaintiff.

177.   By reason of Defendants' breach of fiduciary duty, Plaintiff is entitled to a judgment against Defendants, jointly and severally, for damages in the principal amount of $325,324.46, together with interest thereon at the rate of 21% per annum, compounded monthly, from and after the respective dates of Plaintiff's constituent remittances; together

48

with such other and further relief as is just and proper, including an award of Plaintiffs' costs and disbursements of this action, its legal fess, and an award of punitive damages in an amount to be determined at trial, but in an amount which is not less than $1 million to deter such conduct in the future by these Defendants and others.

**COUNT VI**
**AGAINST DEFENDANTS EMERALD AND**
**XIRINACHS FOR BREACH OF CONTRACT**

178.   Plaintiff repeats the allegations made in paragraphs "1" through "150", "160" through "163", "165" through "173" and "175" through "178" of this Complaint.

179.   By reason of the failure of Defendants Emerald and Xirinachs to timely repay the Emerald Loans in accordance with the original terms thereof of the agreement regarding the making of such Loans, and by reason of the failure of Defendants Emerald and Xirinachs to faithfully guarantee the repayment to Plaintiff of Plaintiff's Emerald Loans, Defendants breached the terms of their respective contracts with Plaintiff.

180.   By reason of Defendants' breach of contract, Plaintiff is entitled to a judgment against Defendants, jointly and severally, for damages in the principal amount of $325,324.46, together with interest thereon at the rate of 21% per annum, compounded monthly, from and after the respective dates of Plaintiff's remittances; and Plaintiff is entitled to recover the foregoing sums from Defendants, jointly and severally, together with such other and further relief as is just and proper, including an award of plaintiffs' the costs and disbursements of this action.

**COUNT VII**
**AGAINST DEFENDANTS EMERALD, ADVISORS**
**AND XIRINACHS FOR BREACH OF CONTRACT**

181.   Plaintiffs repeat the allegations made in paragraphs "1" through "150", "160" through "163", "165" through "173", "175" through "178" and "179" and "180" of this Complaint.

182.   Without regard to the terms of Plaintiff's original contract and agreement with Defendants, Emerald and Xirinachs relating to the Emerald Loans, to induce Plaintiff to

49

withhold from commencing an action against Defendants in connection with the Emerald Loans, including claims for misrepresentation and fraud against Defendants, Defendants' Emerald and Xirinachs entered into a binding contract and agreement to repay Plaintiff's Emerald Loans in accordance with the Payout Schedule.

183.    Defendants Emerald and Xirinachs breached the terms thereof by not making payments in pursuance of the Payout Schedule.

184.    By reason of such breach of contract by Defendants Emerald and Xirinachs, Plaintiff is entitled to a judgment against Defendants, jointly and severally, for damages in the principal amount of $325,324.46, together with interest thereon at the rate of 21% per annum, compounded monthly, from and after the respective dates of Plaintiff's remittances; together with such other and further relief as is just and proper, including an award of plaintiffs' costs and disbursements of this action.

**WHEREFORE**, plaintiffs demand judgment as follows:

1.    On Count I of this Complaint, against all Defendants, jointly and severally, awarding Plaintiffs damages in the amount of $325,324.46, together with contractual interest thereon, and such other and further relief as is just and proper, including the costs and disbursements of this action, an award of Plaintiff's reasonable attorneys' fees and exemplary or punitive damages;

2.    On Count II of this Complaint, against Xirinachs, awarding Plaintiff damages in the amount of $325,324.46, together with appropriate interest thereon, and such other and further relief as is just and proper, including the costs and disbursements of this action and an award of plaintiffs' reasonable attorneys' fees, and exemplary or punitive damages;

3.    On Count III of this Complaint, against all Defendants, jointly and severally, by reason of defendants' fraud, for damages in the principal amount of in the principal amount of $325,324.46, together with interest thereon at the rate of 21% per annum, compounded monthly, from and after the respective dates of Plaintiff's remittances; including an award of plaintiffs' costs and disbursements of this action, and an award of Plaintiff's legal fees, and an

award of punitive damages in an amount to be determined at trial, but in an amount which is not less than three times the amount of Plaintiff's investment of principal, plus all interest accrued thereon.

    4.    On Count IV of this Complaint, against all Defendants, jointly and severally, by reason of Defendants' negligent misrepresentations, for damages in the principal amount of $325,324.46, together with interest thereon at the rate of 21% per annum, compounded monthly, together with such other and further relief as is just and proper, including an award of the costs and disbursements of this action;

    5.    On Count V of this Complaint, against all defendants, jointly and severally, by reason of Defendants' breach of fiduciary duty, for damages in the principal amount of $325,324.46, together with interest thereon at the rate of 21% per annum, compounded monthly, from and after the respective dates of Plaintiff's remittances; including an award of Plaintiffs' costs and disbursements of this action, and an award of Plaintiff's legal fees, and an award of punitive damages in an amount to be determined at trial, but in an amount which is not less than $1 million;

    6.    On Count VI of this Complaint, against all defendants, jointly and severally, by reason of Defendants' breach of contract, for damages in the principal amount of $325,324.46, together with interest thereon at the rate of 21% per annum, compounded monthly, from and after the respective dates of Plaintiff's remittances; together with such other and further relief as is just and proper, including an award of plaintiffs' the costs and disbursements of this action.

    7.    On Count VI of this complaint, against all defendants, jointly and severally, by reason of Defendants' breach of contract, for damages in the principal amount of $325,324.46, together with interest thereon at the rate of 21% per annum, compounded monthly, from and after the respective dates of Plaintiff's remittances; together with such other and further relief as is just and proper, including an award of plaintiffs' the costs and disbursements of this action; and

8. For such other and different relief as to this Court may seem just and proper, together with the costs and disbursements of this action.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial with respect to all Counts of this complaint triable before a jury as a matter of right.

Dated: Old Westbury, New York
September 4, 2008

JEFFREY L. ROSENBERG
& ASSOCIATES, L.L.C.

BY: _____
Jeffrey L. Rosenberg (JR-3597)
Attorneys for Plaintiffs
AIS Ventures, LLC and Andrew
Smoler, as Trustee, acting by and
through the Andrew Smoler 401K
Investment Retirement Account,
46 Morgan Drive-7700