# EXHIBIT A

# INFORMATION PACKAGE



## Purchase of Tobacco Holdings, Inc.

**October, 2006**

# PURCHASE OF
# TOBACCO HOLDINGS, INC.

The enclosed package has been prepared by Emerald Capital Partners, LP. ("Emerald") based upon information obtained by Emerald and other trade and statistical sources that Emerald deems to be reliable. Although Emerald believes that the information contained herein is accurate, Emerald expressly disclaims any and all liability for any representations or warranties express or implied, contained in, or for omissions from, the package or any other written or oral communication transmitted or made available to prospective private lenders.

By reviewing the information contained in this package, you acknowledge your agreement to maintain the confidentiality of all information contained herein. This package and any other written or oral communication made available to prospective private lenders are for the purpose of introducing Emerald in connection with its purchase of Tobacco Holdings, Inc. All copies of this package are to be returned to Emerald upon request. Additional copies of this package will be supplied upon request.

You should rely only on the information contained in this package. Emerald has not authorized any other person to provide you with different information. If anyone provides you with different or inconsistent information, you should not rely upon it. Emerald is not offering the transactions set forth in this package in any jurisdiction in which the transaction is not permitted. You should assume that the information contained in this package is only accurate as of the date on the front cover of the package. Emerald's business, financial condition, results of operations and prospects may have changed since that date.

**Before lending any sums to Emerald, you should review the "Risk Factors" section of the package beginning on page 9.**

EMERALD INVESTMENT PARTNERS, LLC.

# TABLE OF CONTENTS

**Market Analysis**

**Description of Business**

**Accredited Qualified Private Lender Transactions**

**Risk Factors**

**Forward-Looking Statements**

**Use of Loan Proceeds**

**Management**

**Profit and Loss Statement – Emerald**

**Overview of Fund - Emerald**

EMERALD INVESTMENT PARTNERS, LLC.

## MARKET ANALYSIS

In 2005, United States tobacco sales totaled almost $100 billion. Although a May 2005 report from Euromonitor International indicated that volume sales of cigarettes continued their downward trend, that statistic is overstated. In 2004, United States cigarette output was 492.8 *billion* cigarettes which represented a one percent (1%) reduction from 2003 output. Approximate United States cigarette output for 2005 was 490 *billion* cigarettes.

In a November 2005 report, the Centers for Disease Control and Prevention reported that in 2004, an estimated 20.9% (44.5 million) of U.S. adults were current smokers. Of current smokers, 81.3% (36.1 million) smoked every day, and 18.7% (8.3 million) smoked some days. Among those who currently smoked every day, 40.5% (14.6 million) reported that they had stopped smoking for at least one day during the preceding 12 months because they were trying to quit. Among the estimated 42.4% (90.2 million) of persons who had ever smoked, 50.6% (45.6 million) were former smokers.

In 1998, the major companies in the tobacco industry and the attorney generals from forty-six (46) states entered into the Master Settlement Agreement ("MSA") pursuant to which the tobacco industry was required to reimburse the States for expenses related to the treatment of smoking-related illnesses. According to an October 2001 United States Department of Agriculture Electronic Outlook Report from the Economic Research Service, key elements of the MSA include the repayment of $206 billion to the States over 25 years, the payment of $1.5 billion over 10 years to support anti-smoking measures together with $250 million to fund research into reducing youth smoking, limitations on advertising and a ban on the use of cartoon characters in tobacco advertisements. The MSA also includes a ban on "branded" merchandise, limitations on sporting event sponsorship and the disbanding of tobacco trade organizations. In addition to the MSA, cigarette manufacturers agreed to pay $5.15 billion to tobacco growers over 12 years in order to compensate tobacco quota owners and growers for potential reduction in their tobacco reduction and sales resulting from the MSA. The MSA together with the tobacco growers' agreement and the previous four State settlements has had, and will continue to have, an inflationary effect on the price of cigarettes.

As a result of the MSA, cigarette manufacturers have boosted prices in order to offset the reimbursements required by the agreement. Higher prices have curtailed consumption, although not as much as originally expected. The long-term decline in cigarette consumption due to non-economic factors continues as well. According to the USDA October 2001 report, premium cigarette brands continued to increase market share.

In addition to the upwardly spiraling cost of cigarettes caused by the MSA, Federal and State excise taxes have fueled much of the price increase. The Federal excise tax is currently $0.39 per pack and, although technically paid by the cigarette manufacturer, is

EMERALD INVESTMENT PARTNERS, LLC.

actually passed on to the consumer. Every State imposes a cigarette excise tax which range from a few cents to almost $2.50 per pack. In New York City, smokers pay *both* the New York State excise tax of $1.50 per pack *and* the local excise tax of $0.24 per pack.

The opportunity for deep discounters to supply economy cigarettes to tobacco consumers frustrated by escalating cigarette prices has increased. The impact that deep discounters had upon the cigarette market was felt almost immediately and economy brands quickly acquired market share. Rising cigarette prices encouraged savvy smokers to purchase cigarettes from non-traditional retailers, sacrificing convenience for cost savings.

The majority of non-traditional retailers gain their cost advantage by operating in areas with relatively low or no state excise taxes. Tobacco-producing states with very low state cigarette taxes are popular locations for non-traditional retailers, as are Native American reservations, which are exempt from state taxes. Although the Jenkins Act requires that both the tobacco retailer and the tobacco consumer report non-traditional purchases to aid in tax collection, until recently the law has been weakly enforced and consumers have generally avoided payment of their respective state tax.

Against the foregoing backdrop, the changes in the landscape of cigarette advertising, sales, and points of purchase in Native American communities have gone largely unnoticed. Few studies have examined non-traditional cigarette sales, and even fewer have examined the marketing tools utilized by Native American tobacco merchants. Native American cigarette sales are shifting from smoke shops and small-town markets to easily accessible and colorful Internet web sites and telephone sales programs. More than eighty percent (80%) of online tobacco sales originate on Indian Reservations. The attraction of non-traditional tobacco sales is obvious. A University of Minnesota study found that Native American tobacco merchants can offer name-brand cigarettes at almost fifty percent (50%) less than the grocery store or newsstand prices and offer native-brand cigarettes for as little as $10.95 per carton, a fraction of the price of a name-brand carton of cigarettes. The pricing and availability of cigarettes from Native American merchants provides an appealing and easy method for recurring tobacco users to purchase products.

As explained in a CNN Money.com July 14, 2005 article, there are few consumer products that are as well suited to profitable marketing, sale and distribution in non-traditional channels than tobacco. Cigarettes are "branded commodities" that are nationally and internationally recognized by consumers. Brand awareness and brand loyalty are high among tobacco users. Tobacco consumers understand the products purchased and are familiar with the usual price. Cigarette consumers typically use tobacco products in predictable amounts over a specified period of time. The regular consumption pattern facilitates the use of automated e-mail reminders and scheduled product fulfillment, which increases customer loyalty and decreases operational costs. The addictive nature of cigarette smoking sustains strong, continuing and relatively stable market demand for tobacco products. Because of their relatively long shelf life,

EMERALD INVESTMENT PARTNERS, LLC.

light weight and small size, cigarettes can be warehoused, handled and shipped in a cost effective manner and provide significant profit per unit advantages when sold in a non-traditional manner such as over the telephone and internet. Low marketing costs and scalable marginal cost per customer can be achieved by using the advantages of non-traditional retail sales such as internet sites and by telephone sales, links from other sites and e-mail direct marketing. Finally, the standard cigarette price structure, from manufacturer to wholesaler to distributor to retailer to consumer, provides unusually wide margins for each business participant in the distribution channel. Using lower prices to attract consumers can be profitable because the lower cost of non-traditional retail operations allow for both lower consumer product prices and some additional profit for the vendor.

Research indicates that even a small non-traditional cigarette vendor can achieve a fifty percent (50%) gross profit margin. More specifically, the wholesale cost of a carton of name-brand cigarettes approximates $12. With a non-traditional vendor, the price for that same carton of name-brand cigarettes could be $24 or more. The $4 shipping cost is passed onto the consumer. Using the foregoing estimates, a fifty percent (50%) gross profit margin is easily attainable but will vary based upon actual operating costs, efficiencies and sales volume.

Distribution of established "fourth tier" cigarette brands that have been on the market for well over five (5) years has created the incentive for major cigarette distributors to continue to support and to grow with the Native American tobacco merchants.

## DESCRIPTION OF BUSINESS

Tobacco Holdings is an international manufacturer and importer of premium cigarettes. The Company's leading high-quality, value-priced brands include Jim Porter, Bridgeport, Yukon, Bayport and Calon and boasts the experience and resources required to exceed its customer's most stringent expectations. Unlike its value-price competition, Tobacco Holdings has successful experience working with some of the country's largest retail chains and distributors. As a result of this experience, Tobacco Holdings understands requirements such as working within existing distribution, MSA data reporting, risk aversion, restrictive contracts and retail programs, and can offer a lucrative, value-price solution while working within your existing structure.

Tobacco Holdings success comes from the diverse array of talented individuals within the company ranging from world class engineers and researchers to highly trained manufacturing specialists to experts in sales, marketing, finance communications and human resource. Tobacco Holdings is committed to delivering superior quality products and meeting the desires of its consumers. They achieve these goals by continually taking the lead in product innovation, pricing and quality initiatives.

EMERALD INVESTMENT PARTNERS, LLC.

Tobacco Holdings, in conjunction with manufacturing its own brands of cigarettes, has entered into exclusive contracts with two premium cigar companies located in the Dominican Republic and Honduras. Tobacco Holdings has the rights to distribute these cigar lines within the United States and Puerto Rico. In addition, Tobacco Holdings has been developing a new 'little' cigar line called Stallion. Though these are classified as cigars, they have filters and flavors which give the public an alternative to the rising cost of cigarettes as they have a tax rate substantially lower then cigarettes.

Tobacco Holdings currently has a deal pending with the city of San Antonio to erect a cigarette manufacturing plant within the city. San Antonio has offered to post a bond issue on the ballot in excess of $35 million dollars for this project. Once approved and constructed, Tobacco Holdings will handle all manufacturing and distribution form this site reducing the costs from its current international sites thereby increasing its revenues.

Tobacco Holdings is in the process of finalizing a relationship with Berlin Tobacco and Independent Brands of Hamburg, Germany. Through this relationship, Tobacco Holdings will begin distributing their brands through ten (10) countries in Europe. Tobacco Holdings has a similar agreement pending with a distributor in both China and Russia.

Tobacco Holdings has their headquarters in Miami, Florida and a manufacturing and processing operation in the Philippines.

EMERALD INVESTMENT PARTNERS, LLC.

# QUALIFIED PRIVATE LENDER TRANSACTIONS

Upon the execution of appropriate documentation in the form provided by Emerald, Qualified Private Lenders will receive an annualized return on their loans of ___%. Qualified Private Lenders shall have the option of receiving interest payments on a quarterly or annual basis.  In addition, all Qualified Private Lenders will receive a one time bonus, equal to seventy five percent (75%) of their loan amount, upon the sale of Tobacco Holdings with a minimum sales price of $60 Million dollars.

Qualified Private Lenders who elect to provide loans to Emerald must commit their principal for up to twenty four (24) months from the date of the loan with a minimum of twelve (12) months as the "Initial Lending Period". Upon the expiration of the Initial Lending Period, Qualified Private Lenders will have the option to (a) do nothing and keep their principal for the remaining twelve (12) month period (the "Subsequent Lending Period"), or (b) withdraw their principal and any accrued interest. After the first twelve (12) months of a lending period, qualified lenders may recover their principal, less all fees and penalties, by providing Emerald with written notice of their intention to withdraw their loan. Qualified Private Lenders who wish to withdraw their principal prior to the expiration of their Lending Period will be charged an early withdrawal penalty equal to fifteen percent (15%) of their principal and forfeit any accrued interest. Reimbursement will occur within ninety (90) days form the date Emerald receives the initial request.  At the discretion of Emerald, all loans may be paid back, including interest accrued to date, at any time during the lending period.

The minimum principal loan amount is $50,000.  Emerald, at its discretion, requires all potential Qualified Private Lenders to provide it with appropriate financial disclosure, credit history and net worth statements.  In general, Emerald will *not* accept as a Qualified Private Lender any individual whose net worth does not exceed $250,000 and will not accept as a loan any amount in excess of twenty percent (20%) of the net worth of a Qualified Private Lender.

Any and all interest earned by any Qualified Private Lender is earned on a pre-tax basis and the Qualified Private Lender is responsible for the payment of all applicable taxes. Emerald will provide all accepted qualified lenders with the required tax information regarding interest earned in a timely manner and in a year-end statement.

No liabilities or obligations whatsoever are intended to be created hereto between Emerald and any potential Qualified Private Lender.  This package is not intended to constitute, and does not constitute, a legally binding contract to consummate any transaction referred to herein. Any binding legal obligations of any nature shall be only those set forth in a signed document executed by Emerald and any potential Qualified Private Lender.  No party may claim any legal right against the other by reason of the execution of this package or taking any other action or reliance hereupon.

EMERALD INVESTMENT PARTNERS, LLC.

# RISK FACTORS

*Loans to Emerald involve risk.*
*You should carefully consider the risks described below together*
*with all of the other information included in or incorporated by reference*
*in this package before making a loan to Emerald.  The risks and*
*uncertainties described below are not the only risks and uncertainties*
*facing Emerald or its operations.  If any of the following risks actually occur, Emerald's*
*business, financial condition or operating results could be harmed.  In*
*such case, you could lose all or part of the principal funds loaned to Emerald.*

## Risks Related To Tobacco Industry

- **Governments declare tobacco an illegal drug and outlaw the production and sales of such products.**  Although possible, it is highly unlikely that this would occur.  The tobacco industry generates billions of dollars in annual revenues, sells trillions of cigarettes annually and creates an industry with jobs both in the United States and abroad. Additionally, the voting block of smokers would create havoc for any faction that tries to end tobacco production and corresponding sales.

## Risks Related To Tobacco Holdings

- **Tobacco Holdings cannot increase monthly sales to 400,000 cartons.**  The new management group has already secured deals with several foreign entities to help achieve this goal and there are additional pending deals in the offing.  New product lines are also being added to ensure the sales goal is met and surpassed.

- **Current purchaser decides to withdraw offer after sales goal is met.**  This offer to purchase was driven by a client of Emerald who initiated the desire to purchase a tobacco manufacturer and wholesaler. He has committed to this deal.  Should the initial client renege, Emerald has secured a second purchaser for the company.  Should both private sales fail, Emerald will consider taking the company public in an IPO.

- The purchase and sale of Tobacco Holdings will occur through a separately formed company under Emerald incorporated as Sandstone.  The back-end bonus to the lender is predicated upon the successful sale or IPO of the company and will stand on its own merits. The bonus is not guaranteed by Emerald and the lender will not participate in the general success of Emerald during the duration of the deal.

## Risk Guarantees

- While the back-end bonus will be determined by the successful sale of the company, Emerald will stand behind and fully guarantee the principal and interest for each lender regardless of the final sale outcome.   The financial strength and assets of the $600,000,000 fund will support this guarantee.

- 9 -

**EMERALD INVESTMENT PARTNERS, LLC.**

## Competitive Strengths

The new management team of Tobacco Holdings has more than thirty (30) years of combined experience in the manufacturing and distribution of cigarettes and has nationwide market penetration as well as Puerto Rico. As explained above, the sale of tobacco products is relatively steady and predictable thereby providing Tobacco Holdings with regular and recurring income and a strong measure of sales projection accuracy.

## FORWARD-LOOKING STATEMENTS

All statements regarding Emerald's expected financial position and operating results, Emerald's business strategy, and Emerald's business plans are forward-looking statements. These statements can sometimes be identified by Emerald's use of words such as "may", "anticipate", "expect", "intend", "estimate" or similar expressions. Emerald's expectations in any forward-looking statements may not turn out to be correct. Emerald's actual results may be materially different from those discussed in or implied by these statements, and you may consider these differences important in your decision to lend money to Emerald. Important factors that may cause the actual results to be materially different include but are not limited to hose discussed under "Risk Factors". You should not place undue reliance on the forward-looking statements, which speak only as of the date the statements were made.

Emerald believes that it is important to communicate its expectations to potential private lenders. However, there may be events in the future that Emerald is not able to predict accurately or over which Emerald has no control. The risk factors described in the preceding pages, as well as any cautionary language in this package, provide examples of risks, uncertainties and events that may cause Emerald's actual results to differ materially from the expectations described in any forward-looking statements. Before you lend money to Emerald, you should be aware that the occurrence of the events described in these risk factors and elsewhere in this package can materially and adversely affect Emerald's business, operating results and financial condition.

## USE OF LOAN PROCEEDS

Emerald expects to utilize all proceeds from the private loan transactions described in this package to fund the purchase and expansion of Tobacco Holdings.

EMERALD INVESTMENT PARTNERS, LLC.

# MANAGEMENT

Emerald's current management team and executive officers are as follows:

| **Name** | **Company** | **Position and Title** |
|---|---|---|
| Michael J. Xirinachs | Emerald | General Partner |

| **Name** | **Company** | **Position and Title** |
|---|---|---|
| Carl Nappi | Tobacco Holdings | President, Sales & Marketing |

**Michael J. Xirinachs** – General Partner

Michael J. Xirinachs is a specialist in technical analysis and trading trends with a substantial amount of experience with the capital markets including investment banking.  He has held various senior level executive positions in the securities industry and has been an institutional investor for the past five (5) years.  Using his expertise, he has developed and implemented financial solutions for emerging growth companies.  He earned his MA, from Fairfield University and his BA from St. John's University.

**Carl Nappi** – President, Sales & Marketing

Carl Nappi, a retired New York City Police Sergeant, has been involved in the wholesale cigarette sales industry for the past ten (10) years including Native American cigarette sales through out the United States.  He is currently a professor of HR Law at St. Joseph's College and has a B.S. in Interdisciplinary Studies and an M.S. in Human Resources Management and Labor Relations from the New York Institute of Technology.  Carl also holds a Paralegal certificate from Adelphi University and is the legal counsel for the Retired Sergeants Association of New York City.

**EMERALD INVESTMENT PARTNERS, LLC.**

# Emerald Asset Advisors LLC

## Profit and Loss Statement

## (2004)

| | |
|---|---|
| **Total Net Sales/ Gross Income** | **31,300,220.00** |

**Operating Expenses**

| | |
|---|---|
| **Wages** | **467,254.00** |
| **Taxes** | ----- |
| **Rent** | **78,000.00** |
| **Insurance** | **27,843.00** |
| **Commissions** | **4,200,754.00** |
| **Job Expenses** | **102,000.00** |
| **Telephone and Utilities** | **71,956.00** |
| **Supplies** | **11,001.55** |
| **Employee Benefits** | **118,800.00** |
| **Travel/ Entertainment** | **97,032.00** |
| **Office Expense** | **9,000.00** |
| **Legal/Accounting** | **454,900.00** |
| **Equipment Leases** | **22,045.00** |
| **Dues/Subscriptions** | **8,027.00** |

| | |
|---|---|
| **Total Operating Expenses** | **5,668,612.55** |

| | |
|---|---|
| **Net Income** | **25,631,607.45** |

**The accompanying report is an integral part of the Financial Statements Attached.**

**EMERALD INVESTMENT PARTNERS, LLC.**

# EMERALD CAPITAL PARTNERS

## AN OVERVIEW OF THE FUND

**Objective**

To provide growth of capital

**Principal Strategies**

Emerald Capital Partners seeks to achieve its objective by investing, under normal market conditions, at least 80% of its net assets in common stocks of domestic and foreign companies whose market capitalizations are within the range of capitalizations of companies included in the Russell 2000@ Growth Index (small cap stocks). The Fund emphasizes relatively new or unseasoned companies in their early stages of development or smaller companies positioned in new or emerging industries where there is opportunity for rapid growth.

In the selection process, Emerald seeks companies whose earnings, it believes, are likely to grow faster than the economy. Emerald may look at a number of factors regarding a company, such as: aggressive or creative management, technological or specialized expertise, new or unique products or services, entry into new or emerging industries, growth in earnings/growth in sales, security size and liquidity.   Generally, in determining whether to sell a security, management uses the same type of analysis that it uses in buying securities. For example, Emerald may sell a security if it determines that the stock no longer offers significant growth potential, which may be due to a change in the business or management of the company or a change in the industry of the company. We may also sell a security to take advantage of more attractive investment opportunities or to raise cash.

**Principal Risks of Investing in the Fund**

A variety of factors can affect the investment performance of Emerald Capital Partners. These include: securities selected for the Fund may not perform as well as the securities held by other mutual funds with investment objectives that are similar to those of the Fund; the earnings performance, credit quality and other conditions of the companies whose securities the Fund holds; the mix of securities in the Fund, particularly the relative weightings in, and exposure to, different sectors and industries; managements skill in evaluating and selecting securities for the Fund; adverse stock and bond market conditions, sometimes in response to general economic or industry news, that may cause the prices of the Fund's holdings to fall as pan of a broad market decline.

Market risk for small to medium sized companies may be greater than that for large companies. Smaller companies are more likely to have limited financial resources and inexperienced management. Stock of smaller companies may also experience volatile trading and price fluctuations.

- 13 -

**EMERALD INVESTMENT PARTNERS, LLC.**

Due to the nature of the Funds permitted investments, primarily the small cap stocks of new and/or unseasoned companies, companies in their early stages of development or smaller companies in new or emerging industries, the Fund may be subject to the following additional risks: products offered may fail to sell as anticipated; a period of unprofitability may be experienced before a company develops the expertise and clientele to succeed in an industry; the company may never achieve profitability; economic, market and technological factors may cause the new industry itself to lose favor with the public.

The Fund may invest in foreign securities, which present additional risks such as currency fluctuations and political or economic conditions affecting the foreign country.  As with any mutual fund, the value of the Funds shares will change and you could lose money on your investment. An investment in the Fund is not a bank deposit and is not insured or guaranteed by the Federal Deposit Insurance Corporation or any other government agency.  For more information about the Fund's principal investment strategies and risks, please see "Additional Information about Principal Investment Strategies, Other Investments and Risks.

**Who May Want to Invest**

Emerald is designed for investors willing to accept greater risks than are present with many other mutual funds. It is not intended for those investors who desire assured income and conservation of capital. You should consider whether the Fund fits your particular investment objectives.

**PERFORMANCE**

**Emerald Capital Partners**

The bar chart and performance table below provide some indication of the risks of investing in the Fund by showing changes in the Funds performance from year to year and by showing how the Funds average annual total returns for the periods shown compare with those of a broad measure of market performance and a peer group average. The bar chart does not reflect any deferred sales charge that you may be required to pay upon redemption of the Fund's Class C shares. If the deferred sales charge were included, the returns would be less than those shown.

The bar chart and the performance table assume payment of dividends and other distributions in shares. As with all mutual funds, the Fund's past performance (before and after taxes) does not necessarily indicate how it will perform in the future.  Note that the performance information in the bar chart and performance table is based on calendar-year periods, while the information shown in the Financial Highlights section of this Prospectus and in the Fund's shareholder reports is based on the Fund's fiscal year.  Investment return and principal value of an investment will fluctuate, and shares, when redeemed, may be worth more or less than their original cost.

# Fund's most recent performance

Chart of Year-By-Year Returns as of December 31 each year

'04 - 102.45%

EMERALD INVESTMENT PARTNERS, LLC.

'05 - 66.67%

Please refer to the following chart for the comparison of the Russell 2000/3000 index as it relates to the performance of EMERALD CAPITAL PARTNERS

**MONTHLY DATA** through December 31, 2005

| Capitalization (in billions) | |
|---|---|
| Average Market Cap($-WTD) | 1.11 |
| Median Market Cap | 0.598 |
| Largest Company by Market Cap | 4.382 |
| Smallest Company by Market Cap | 0.026 |
| **Fundamental Characteristics** | |
| Price/Book | 2.31 |
| Dividend Yield | 1.1 |
| P/E Ex-Neg Earnings | 19.5 |
| Lt Growth Forecast-IBES | 14.98% |
| EPS Growth 5 years | 11.4 |

**TOTAL RETURNS** in Percentages



|  | December | 3 month | YTD | 1 yr | 3 yr | 5 yr | 10 yr |
|---|---|---|---|---|---|---|---|
| Russell 2000 | -0.46 | 1.13 | 4.55 | 4.55 | 22.13 | 8.22 | 9.26 |
| Russell 3000 | 0.09 | 2.04 | 6.12 | 6.12 | 15.90 | 1.58 | 9.20 |

EMERALD INVESTMENT PARTNERS, LLC.

# Exhibit B

THIS PROMISSORY NOTE (THE "SECURITIES") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("THE ACT"), OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES MAY NOT BE PLEDGED, SOLD, ASSIGNED OR TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN APPLICABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT AND SUCH LAWS.

### 18% PROMISSORY NOTE

October __, 2006

U.S. $_____

1.    **FOR VALUE RECEIVED**, Emerald Capital Partners, LLC, a New York limited liability company (the "Company"), subject to the terms hereunder hereby guarantees to pay to the order of _____ (the "Lender") the principal amount of _____ Dollars ($_____) (the "Principal Amount"), together with simple interest on the Principal Amount under this promissory note (this "Note") at the per annum rate of eighteen percent (18%). (calculated and compounded monthly) The Principal Amount on this Note and any accrued, but unpaid interest shall become due and payable in one installment on [_____ __, 2008] (the "Maturity Date"). Prior to the Maturity Date, accrued interest shall become due and payable quarterly in arrears on the last day of each calendar year quarter beginning with the quarter ending March 31, 2007.

2.    **Early Withdrawal**.    The Lender may elect to withdraw the Principal amount prior to the Maturity Date subject to the following terms:

a.)    At any time prior to _____, 2007 (twelve months post closing, the "Minimum Loan Period") upon ninety days prior written notice to Company in which event Lender shall forfeit rights to the bonus payment described below and be charged an early withdrawal penalty equal to fifteen percent (15%) of the Principal Amount and repayment by offset of interest previously paid to Lender and forfeiture of accrued interest not yet paid;

b.)    At any time after the Minimum Loan Period, but prior to the Maturity Date, upon ninety (90) days written notice, in which event Lender shall be paid the Principal Amount, subject to repayment by offset against the Principal Amount any interest payments received for periods following the Minimum Loan Period, and shall receive any interest accrued but not yet paid to the date of repayment.

3.    **Bonus Payment**.    In the event the Company is sold for an amount equal to or greater than sixty-million dollars ($60,000,000.00) prior to full repayment of the Principal Amount and all accrued interest thereon, any Lender which has not provided a written notice to the Company electing an early withdrawal shall be entitled to a one time bonus payment equal to

seventy-five percent (75%) of the Principal Amount in addition to, and payable at the time of repayment of, the Principal Amount and the accrued interest thereon.

    4.    **Payment**.    Both the Principal Amount and accrued interest (subject to the above) shall be paid in lawful money of the United States of America to the Lender at his address as reflected in the Financing Signature Page to the Note Purchase Agreement (as hereinafter defined), or at such other address as the Lender may designate by notice in writing to the Company in immediately available funds.

    5.    **Prepayment Right**.    Prior to the time that the Company shall have received a firm written offer for the purchase of the Company, the Company shall have the right, at any time and from time to time on no less than 60 days prior written notice to Lender, to prepay the entire outstanding principal balance of this Note in whole, without premium or penalty, provided that such prepayment shall include all interest then accrued but unpaid on the Note.  Should Company elect to prepay the entire outstanding principal balance of this note, the Lender will still be entitled to the Bonus Payment as outlined in section 3 above.

    6.    **Payable Days**.    If any payment hereunder falls due on a Saturday, Sunday or legal holiday, it shall be payable on the next succeeding business day and such additional time shall be included in the computation of interest.

    7.    **Note, One of a Series**.    This Note is one of a series of 18% Promissory Notes containing substantially identical terms and conditions issued pursuant to that certain Note Purchase Agreement by and between the Company and certain Lenders dated _____ __, 2006 (the "Note Purchase Agreement").  All capitalized terms not defined herein shall have the meanings ascribed thereto in the Note Purchase Agreement.

    8.    **Senior**. The indebtedness evidenced by this Note and the payment of the Principal Amount and interest thereof shall be Senior (as hereinafter defined) to, and have priority in right of payment over, all indebtedness of the Company.  "Senior" shall be deemed to mean that, in the event of any default in the payment of the obligations represented by this Note or of any liquidation, insolvency, bankruptcy, reorganization, or similar proceedings relating to the Company, all sums payable on this Note, shall first be paid in full, with interest, if any, before any payment is made upon any other indebtedness, now outstanding or hereinafter incurred, and, in any such event, any payment or distribution of any character which shall be made in respect of any other indebtedness of the Company, shall be paid over to the holder of this Note for application to the payment hereof, unless and until the obligations under this Note (which shall mean the Principal Amount and other obligations arising out of, premium, if any, interest on, and any costs and expenses payable under, this Note) shall have been paid and satisfied in full.

    9.    **Affirmative Covenants**.    The Company covenants and agrees that, while any amounts under this Note are outstanding, it shall:

Page 2 of 7

a)      Do all things necessary to preserve and keep in full force and effect its corporate existence, including, without limitation, all licenses or similar qualifications required by it to engage in its business in all jurisdictions in which it is at the time so engaged; and continue to engage in business of the same general type as conducted as of the date hereof; and (ii) continue to conduct its business substantially as now conducted or as otherwise permitted hereunder;

b)      Pay and discharge promptly when due all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property before the same shall become delinquent or in default, which, if unpaid, might reasonably be expected to give rise to liens or charges upon such properties or any part thereof, unless, in each case, the validity or amount thereof is being contested in good faith by appropriate proceedings and the Company has maintained adequate reserves with respect thereto in accordance with GAAP;

c)      Comply in all material respects with all federal, state and local laws and regulations, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations and requirements applicable to it (collectively, "Requirements") of all governmental bodies, departments, commissions, boards, companies or associations insuring the premises, courts, authorities, officials or officers which are applicable to the Company or any of its properties, except where the failure to so comply would not have a material adverse effect on the results or operations of the Company and its Subsidiaries taken as a whole ("Material Adverse Effect"); provided, however, that nothing provided herein shall prevent the Company from contesting the validity or the application of any Requirements;

d)      Keep proper records and books of account with respect to its business activities, in which proper entries, reflecting all of their financial transactions, are made in accordance with GAAP; and

e)      Notify the Lender in writing, promptly upon learning thereof, of any litigation or administrative proceeding commenced or threatened against the Company which involves a claim in excess of $200,000.

10.   **Negative Covenants**. The Company covenants and agrees that while any amount of this Note is outstanding it will not directly or indirectly:

a)      Incur, guarantee, assume or otherwise become responsible for (directly or indirectly) any indebtedness that is senior or pari passu to the Notes, without the prior written consent of the Lender;

b)      Declare or pay, directly and indirectly, any dividends or make any distributions, whether in cash, property, securities or a combination thereof, with respect to (whether by reduction of capital or otherwise) any ownership interests of its capital structure (including without limitation preferred interests, if any) or directly or indirectly redeem, purchase, retire or

otherwise acquire for value any of its ownership interests or set aside any amount for any such purpose; and

       c)      Sell, transfer, discount or otherwise dispose of any claim or debt owing to it, including, without limitation, any notes, accounts receivable or other rights to receive payment, except for reasonable consideration and in the ordinary course of business.

       11.    **Events of Default**. The entire unpaid Principal Amount under this Note and the interest due thereon shall forthwith become and be due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived, if any one or more of the following events (herein called "Events of Default") shall have occurred (for any reason whatsoever and whether such happening shall be voluntary or involuntary or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body) and be continuing at the time of such notice, except to the extent contemplated by the opening paragraph hereof, that is to say:

1.     a)      the Company shall: ) fail to pay any amounts owed hereunder as required under the terms of this Note; or ) have an event of default occur and be continuing under indebtedness of the Company (other than this Note) such that the holders of such indebtedness have declared the outstanding principal and accrued interest to be immediately due and payable;

       b)      if the Company shall admit in writing its inability to pay its debts generally as they become due;

       c)      file a petition in bankruptcy or a petition to take advantage of any insolvency act;

       d)      make an assignment for the benefit of creditors;

       e)      consent to the appointment of a receiver of the whole or any substantial part of its assets;

       f)      on a petition in bankruptcy filed against it, be adjudicated a bankrupt; or

       g)      file a petition or answer seeking reorganization or arrangement under the Federal bankruptcy laws or any other applicable law or statute of the United States of America or any State, district or territory thereof;

       h)      if a court of competent jurisdiction shall enter an order, judgment, or decree appointing, without the consent of the Company, a receiver of the whole or any substantial part of Company's assets, and such order, judgment or decree shall not be vacated or set aside or stayed within 120 days from the date of entry thereof;

i)       if, under the provisions of any other law for the relief or aid of debtors, any court of competent jurisdiction shall assume custody or control of the whole or any substantial part of Company's assets and such custody or control shall not be terminated or stayed within 120 days from the date of assumption of such custody or control; or

j)       Failure by the Company to perform or observe in any material respect any covenant or agreement of the Company contained in this Note, which remains uncured for a period of thirty (30) days from the date the Company is notified of such default.

12.     **Remedies**. In case an Event of Default has occurred and is continuing, Lender by written notice to the Company, may declare the principal amount of this Note, plus accrued interest, to be immediately due and payable, and upon any such declaration such principal and accrued interest shall become due and payable immediately. Upon such declaration, the rate of interest on the unpaid principal shall be increased to twenty-five percent (25%) per annum or such lower rate that is the maximum rate allowed by law (the "Default Rate") from the date of such declaration until such unpaid principal is repaid in full. The provisions herein for a Default Rate shall not be deemed to extend the time for any payment hereunder or to constitute a "grace period" giving the Company a right to cure any default. Except as provided herein, the Company and all endorsers of this Note hereby waive presentment for payment, protest, and notice of protest of this Note. The Company and all endorsers of this Note shall pay the Holder's reasonable expenses and costs in collecting and enforcing this Note.

13.     **Amendments and Waivers**. Any provision of this Note to the contrary notwithstanding, changes in or additions to this Note may be made, and compliance with any term, covenant, condition or provision set forth in the Notes may be omitted or waived (either generally or in a particular instance and either retroactively or prospectively), and any default or Event of Default and the consequences thereof may be waived, by a consent or consents in writing signed by the Lender; provided, however, that (i) the Company shall deliver copies of the form of such consent or consents to any Lender who did not execute the same; (ii) no such consent shall be effective to reduce the principal of or rate of interest payable on any Notes, or to postpone the date fixed for the payment of the principal thereof or of interest thereon, without the consent of the Lender of each Note so affected; and (iii) no such consent shall extend to or impair any obligation not expressly waived or impair any right consequent thereon. Any consent may be given subject to satisfaction of conditions stated therein. A waiver on any occasion shall not be construed as a bar to or a waiver of any such right or remedy on any future occasion.

14.     **Notices**.

a.)     All notices, requests, consents, and other communications under this Note shall be in writing and shall be deemed delivered (i) three (3) business days after being sent by registered or certified mail, return receipt requested, postage prepaid or (ii) one (1) business day after being sent via a reputable nationwide overnight courier service guaranteeing next business day delivery, in each case to the intended recipient as set forth below:

If to the Company:

        Emerald Capital Partners LLC
        425 Broad Hollow Rd.
        Melville, NY 11747
        Attn: Michael Xirinachs, President

    If to the Lender:   to the address provided to Company by Lender in its Financing Signature Page.


    b.)     Any party may give any notice, request, consent or other communication under this Note using any other means (including, without limitation, personal delivery, messenger service, telecopy, first class mail or electronic mail), but no such notice, request, consent or other communication shall be deemed to have been duly given unless and until it is actually received by the party for whom it is intended.  Any party may change the address to which notices, requests, consents or other communications hereunder are to be delivered by giving the other parties notice in the manner set forth in this Section.

    15.   **Conflicting Agreements**.  In the event of any inconsistencies between the terms of this Note and the terms of any other document related to the loan evidenced by this Note, the terms of this Note shall prevail.

    16.   **Severability**.  The unenforceability or invalidity of any provision or provisions of this Note as to any persons or circumstances shall not render that provision or those provisions unenforceable or invalid as to any other provisions or circumstances, and all provisions hereof, in all other respects, shall remain valid and enforceable.

    17.   **Governing Law**.  This Note shall be governed by and construed under the laws of the State of New York as applied to agreements among New York residents entered into and to be performed entirely within New York.  The Company (1) agrees that any legal suit, action or proceeding arising out of or relating to this Note shall be instituted exclusively in New York State Supreme Court, County of Suffolk, or in the United States District Court for the Southern District of New York, (2) waives any objection which the Company may have now or hereafter to the venue of any such suit, action or proceeding, and (3) irrevocably consents to the jurisdiction of the New York State Supreme Court, County of Suffolk, and the United States District Court for the Southern District of New York in any such suit, action or proceeding.  The Company further agrees to accept and acknowledge service of any and all process which may be served in any such suit, action or proceeding in the New York State Supreme Court, County of Suffolk, or in the United States District Court for the Southern District of New York and agrees that service of process upon the Company mailed by certified mail to the Company's address shall be deemed in every respect effective service of process upon the Company, in any such suit, action or proceeding.   THE PARTIES HERETO AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY.

18.   **Waivers**.  The nonexercise by either party of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

19.   **Lost Documents**.  Upon receipt by the Company of evidence satisfactory to it of the loss, theft, destruction or mutilation of this Note or any Note exchanged for it, and (in the case of loss, theft or destruction) of indemnity reasonably satisfactory to it (including the posting of a bond, if reasonably requested), and upon reimbursement to the Company of all reasonable expenses incidental thereto, and upon surrender and cancellation of such Note, if mutilated, the Company will make and deliver in lieu of such Note a new Note of like tenor and unpaid principal amount and dated as of the original date of this Note.

**IN WITNESS WHEREOF**, the Company has caused its duly authorized officer to execute this Note as of the date first written above.

**Emerald Capital Partners LLC**

By:_____
      Michael Xirinachs, President

Page 7 of 7

# Exhibit C

## NOTE PURCHASE AGREEMENT

THIS NOTE PURCHASE AGREEMENT (the **"Agreement"**) is made as of _____, 2006, by and between Emerald Capital Partners, LLC., a New York limited liability company (the **"Company"**), and the investors listed on the Schedule of Investors attached hereto (each an **"Investor"** and collectively, the **"Investors"**).

WITNESSETH:

WHEREAS, in order to fund the purchase price and operations funding with respect to the acquisition (the **"Acquisition"**) by Sand Stone Investment Partners, LLC ("**Sand Stone**") of substantially all of the assets of Tobacco Holdings, Inc., Inc., a Florida corporation  pursuant to an Asset Purchase Agreement (the **"Asset Purchase Agreement"**) subject to final approval by the Tobacco Trade Bureau (the **"TTB**," previously a division of the Alcohol, Tobacco and Firearms branch of the US government) and to provide operational funding post-Closing, the Company desires to sell its promissory notes in the aggregate principal amount of $_,000,000 (the **"Notes"**), in the form attached as Exhibit A hereto, and the Investors desire to purchase from the Company and Company desires to sell $__,000,000 in principal amount of Notes;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.    Purchase and Sale of Notes.

1.1    Issuance and Sale of Notes.  Subject to the terms and conditions of this Agreement, the Investors agree to purchase at the Closing (as hereafter defined), and the Company agrees to issue and sell to the Investors at the Closing, the amount of Notes set forth opposite each Investor's name on the Signature Page hereto, for an aggregate purchase price of _____ Million ($__,000,000) Dollars (the **"Purchase Price"**)

1.2    Closing.

(a)    The closing of the purchase and sale of $__,000,000 principal amount of Notes under this Agreement (the **"Closing"**) shall be held at the offices of Emerald Capital Partners, LLC, 425 Brook Hollow Rd., Melville, New York (or remotely via the exchange of documents and signatures), on or before _____, 2006, which date may be extended to _____, 2006 at the sole election of the Company, in the event the Company has negotiated an extension to consummate the Acquisition (the date of the Closing is hereinafter referred to as the **"Closing Date"**).

(b)    All subscription funds for the Notes will be deposited into a non-interest bearing Company account with such funds to be held solely for funding the Asset Purchase Agreement and the operations of Sand Stone following the Closing (the **"Escrow Account"**) with _____

-1-

Bank. If $\_\_ Million of subscriptions for the Notes are not received by the Closing Date, the offering will be immediately terminated and all of the subscription funds held in the Escrow Account will be promptly refunded to subscribers in full, without interest or deduction. At such time as the Company has received and accepted subscriptions for $\_\_ Million of Notes, and Sand Stone has received final approval of the purchase from the TTB, the subscription proceeds will be released from the Escrow Account to the Company.

1.     At the Closing, or as soon as reasonably possible thereafter, the Company shall deliver to the Investors, the Notes against payment of the Purchase Price to the Company.

2.     Representations and Warranties of the Company.  The Company hereby represents and warrants to the Investors, except as set forth on a Schedule of Exceptions to Representations and Warranties attached hereto as Exhibit B (the **"Schedule of Exceptions"**), the  following:

2.1     Subsidiaries. The Company does not presently own or control, directly or indirectly, any interest in any other corporation, association, or other business entity except as disclosed in governmental filings, if any (each, a **"Subsidiary"** and collectively, the **"Subsidiaries"**). Unless the context requires otherwise, all references herein to the "Company" shall refer to the Company and its Subsidiaries. The Company is not a party to any joint venture, partnership, or similar arrangement.

2.2     Organization. Good Standing, and Qualification. The Company is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of New York, and has all requisite corporate power and authority to carry on its business as now conducted. The Subsidiaries are duly organized in their respective jurisdictions of organization, validly existing and in good standing in such respective jurisdictions and each has the power and authority to carry on its respective business as now conducted. The Company and the Subsidiaries are duly qualified to transact business and are in good standing in each jurisdiction in which the failure so to qualify would have a Material Adverse Effect (as hereafter defined) on the Company's business or properties.

2.3     Authorization. All actions on the part of the Company, its officers, managers, and members necessary for the authorization, execution, and delivery of this Agreement and the Notes (collectively, the "Transaction Documents"), the performance of all obligations of the Company hereunder and thereunder and the authorization, issuance (or reservation for issuance), and delivery of the Notes being sold hereunder, has been taken or will be taken prior to the Closing, and the Transaction Documents constitute valid and legally binding obligations of the Company, enforceable in accordance with their respective terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, and (iii) to the extent the indemnification provisions contained in the Transaction Documents may be limited by applicable federal or state laws.

2.4     Valid Issuance of Notes.  The Notes being purchased by the Investors hereunder, when issued, sold, and delivered in accordance with the terms hereof for the consideration provided for herein, will be duly and validly issued, and, based in part upon the representations of the Investors in this Agreement, will be issued in compliance with all applicable federal and state securities laws.

2.5     Filings, Consents and Approvals.  Except as set forth on Exhibit B, neither the Company nor any Subsidiary is required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person in connection with the execution, delivery and performance by the Company of the Transaction Documents, other than in cases where the failure to obtain such consent, waiver, authorization or order, or to give such notice or make such filing or registration could not have or result in, individually or in the aggregate, a material adverse effect on the results or operations, business, assets, properties, prospects or financial condition of the Company and its Subsidiaries taken as a whole ("Material Adverse Effect").

2.6     Litigation.  There is no action, suit, proceeding, claim or investigation pending or, to the knowledge of the Company, currently threatened against the Company which questions the validity of the Transaction Documents, or the right of the Company to enter into any of them, or to consummate the transactions contemplated hereby or thereby, or which might result, either individually or in the aggregate, in any material adverse changes in the assets, condition, affairs, or prospects of the Company, financially or otherwise, or any change in the current equity ownership of the Company, nor is the Company aware that there is any basis for the foregoing. The foregoing includes, without limitation, actions, pending or threatened (or any basis therefor known to the Company), involving the prior employment of any of the Company's employees, their use in connection with the Company's business of any information or techniques allegedly proprietary to any of their former employers, or their obligations under any agreements with prior employers. The Company is not a party or subject to the provisions of any order, writ, injunction, judgment, or decree of any court or government agency or instrumentality.

2.7     Compliance with Other Instruments.  The Company is not in violation or default of any provisions of its Certificate of Organization, as amended, or of any instrument, judgment, order, writ, decree, mortgage, indenture, lease, license or contract to which it is a party or by which it is bound or, to its knowledge, of any provision of federal, state, or local statute, rule, or regulation applicable to the Company, except as would not reasonably be expected, singly or in the aggregate, to have a Material Adverse Effect.  The execution, delivery, and performance of the Transaction Documents and the consummation of the transactions contemplated thereby will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, order, writ, decree or contract, or an event which results in the creation of any lien, charge, or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization, or approval applicable to the Company, its business or operations, or any of its assets or properties, except as would not reasonably be expected, singly or in the aggregate, to have a Material Adverse Effect.

2.8     Permits.  The Company has all material franchises, permits, licenses, and any similar authority necessary for the conduct of its business as now being conducted by it, the lack of which could materially and adversely affect the business, properties, prospects, or financial condition of the Company and believes it can obtain, without undue burden or expense, any similar authority for the conduct of its business as planned to be conducted.  The Company is not in default in any material respect under any of such franchises, permits, licenses, or other similar authority.

2.9     Compliance with Laws.  The conduct of business by the Company and each Subsidiary as presently and proposed to be conducted is not subject to continuing oversight, supervision, regulation or examination by any governmental official or body of the United States or any other jurisdiction wherein the Company or any Subsidiary conducts or proposes to conduct such business, except such regulation as is applicable to commercial enterprises generally.  Neither the Company nor any of the Subsidiaries has received any notice of any violation of or noncompliance with, any federal, state, local or foreign laws, ordinances, regulations and orders (including, without limitation, those relating to environmental protection occupational safety and health, federal securities laws, equal employment opportunity, consumer protection, credit reporting, "truth-in-lending", and warranties and trade practices) applicable to its business or to the business of any Subsidiary, the violation of; or noncompliance with, which would have a materially adverse effect on either the Company's business or operations, or that of any Subsidiary, and the Company knows of no facts or set of circumstances which would give rise to such a notice.

2.11    Disclosure.  This Agreement, the Note, and any other statements or certificates made or delivered in connection herewith or therewith, do not contain any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading.

3.      Representations and Warranties of the Investors.  Each of the Investors, severally and not jointly, hereby represents and warrants that:

3.1     Authorization.   The Transaction Documents constitute valid and legally binding obligations of the Investor enforceable in accordance with their terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

3.2     Purchase Entirely for Own Account.  The Notes to be purchased by the Investor will be acquired for investment for the Investor's own account and not with a view to the resale or distribution of any part thereof.  The Investor represents that it has full power and authority to enter into this Agreement.

3.3     Disclosure of Information.   The Investor acknowledges that it has received all the

-4-

information that it has requested relating to the Company and the purchase of the Notes, has had an opportunity to review and question the Company in connection with its finances and has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Notes. The Investor further represents that it has reviewed that certain Asset Purchase Agreement and has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the acquisition and business of TH. The foregoing, however, does not limit or modify the representations and warranties of the Company in Section 2 of this Agreement or the right of the Investor to rely thereon.

3.4     Accredited Investor. The Investor is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities and Exchange Commission (the "SEC"), as presently in effect.

3.5     Restricted Securities.  Investor understands that the Notes that it is purchasing is characterized as "restricted securities" under the federal securities laws inasmuch as it is being acquired from the Company in a transaction not involving a public offering, and that under such laws and applicable regulations such securities may be resold without registration under the Act, only in certain limited circumstances.  In this connection, the Investor represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

3.6     Legends.  It is understood that the certificates evidencing the Notes may bear the following legend:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AS SET FORTH IN THIS CERTIFICATE. THE SECURITIES REPRESENTED HEREBY MAY NOT BE SOLD, TRANSFERRED, OR OTHERWISE DISPOSED OF IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN OPINION OF COUNSEL, REASONABLY ACCEPTABLE TO COUNSEL FOR THE COMPANY, TO THE EFFECT THAT THE PROPOSED SALE, TRANSFER, OR DISPOSITION MAY BE EFFECTUATED WITHOUT REGISTRATION UNDER THE ACT."

3.7     Investor Questionnaire. If requested by the Company, the Investor covenants to execute and deliver to the Company prior to, at or promptly following the Closing an investor questionnaire supplied by the Company.

4.      Conditions of the Investors' Obligations at Closing.  The obligations of the Investors under subsection 1.1 of this Agreement are subject to the fulfillment on or before the Closing of each of the following conditions:

4.1     Representations and Warranties.  The representations and warranties of the Company contained in Section 2 hereof shall be true on and as of the Closing with the same effect as

though such representations and warranties had been made on and as of the date of such Closing.

4.2     Performance.  The Company shall have performed and complied with all agreements, obligations, and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Closing.

4.3     Delivery of Notes.  The Company shall have delivered the Notes to the Investors, as specified in Section 1.

4.4     Closing the Acquisition.   Concurrent with the Closing, the Company shall have consummated the acquisition of substantially all of the assets of TH pursuant to the Asset Purchase Agreement.

5.      Conditions of the Company's Obligations at Closing.  The obligations of the Company to the Investors under this Agreement are subject to the fulfillment on or before any Closing of each of the following conditions by the Investors:

5.1     Representations and Warranties.  The representations and warranties of the Investors contained in Section 3 shall be true on and as of such Closing with the same effect as though such representations and warranties had been made on and as of such Closing.

5.2     Payment of Purchase Price.  The Investors shall have delivered the Purchase Price specified in Section 1.2.

6.      Indemnification. The Company agrees to indemnify and hold harmless Investors and any of Investors' general partners, employees, officers, directors, members, agents and other representatives (collectively, the "Indemnitees"), against any investigations, proceedings, claims or actions and for any expenses, damages, liabilities or losses (joint or several) arising out of such investigations, proceedings, claims or actions, to which the Indemnitees may become subject, whether under the act or any rules or regulations promulgated thereunder, the Exchange Act, or any rules or regulations promulgated thereunder, or any state law or regulation, or common law, that arise out of or are based upon any breach by the Company of any representation, warranty, agreement, obligation or covenant of the Company contained herein. The Company also agrees to reimburse the Indemnitees for any legal or other expenses reasonably incurred in connection with investigating or defending any such investigations, proceedings, claims or actions, as such expenses or other costs are incurred.  Any indemnity obligation of the Company to an Investor pursuant to this Section 6 shall be limited to the net proceeds received from such Investor at Closing.

7. Miscellaneous.

7.1     Survival of Warranties.  All of the representations and warranties made herein shall survive the execution and delivery of this Agreement for a period of six months.  The Investors are entitled to rely, and the parties hereby acknowledge that the Investors have so relied, upon

the truth, accuracy and completeness of each of the representations and warranties of the Company contained herein, irrespective of any independent investigation made by Investors. The Company is entitled to rely, and the parties hereby acknowledge that the Company has so relied, upon the truth, accuracy and completeness of each of the representations and warranties of the Investors contained herein, irrespective of any independent investigation made by the Company.

7.2    Successors and Assigns. This Agreement is personal to each of the parties and may not be assigned without the written consent of the other parties; provided, however, that any of the Investors shall be permitted to assign its rights under this Agreement to any affiliate of such Investor.

7.3    Governing Law. This Agreement shall be governed by and construed under the laws of the State of New York as applied to agreements among New York residents entered into and to be performed entirely within New York. The Company (1) agrees that any legal suit, action or proceeding arising out of or relating to this Agreement shall be instituted exclusively in New York State Supreme Court, County of Suffolk, or in the United States District Court for the Southern District of New York, (2) waives any objection which the Company may have now or hereafter to the venue of any such suit, action or proceeding, and (3) irrevocably consents to the jurisdiction of the New York State Supreme Court, County of Suffolk, and the United States District Court for the Southern District of New York in any such suit, action or proceeding. The Company further agrees to accept and acknowledge service of any and all process which may be served in any such suit, action or proceeding in the New York State Supreme Court, County of Suffolk, or in the United States District Court for the Southern District of New York and agrees that service of process upon the Company mailed by certified mail to the Company's address shall be deemed in every respect effective service of process upon the Company, in any such suit, action or proceeding.   THE PARTIES HERETO AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY.

7.4    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement, once executed by a party, may be delivered to the other party hereto by facsimile transmission of a copy of this Agreement bearing the signature of the party so delivering this Agreement.

7.5    Titles and Subtitles. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

7.6    Notices. Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient upon receipt, when delivered personally or by courier, overnight delivery service or confirmed facsimile, or forty-eight (48) hours after being deposited, in the U.S. mail as certified or registered mail with postage prepaid, if such notice is addressed to the party to be

notified at such party's address or facsimile number as set forth below or as subsequently modified by written notice. Any party may change its address for such communications by giving notice thereof to the other parties in conformity with this Section.

7.7     Agency Fee. Each party represents that it neither is nor will be obligated for any finders' or brokers' fee or commission in connection with this transaction.

7.8     Transaction Expenses: Enforcement of Transaction Documents. The Company and each Investor shall pay their respective costs and expenses incurred with respect to the negotiation, execution, delivery and performance of this Agreement. If any action at law or in equity is necessary to enforce or interpret the terms of the Transaction Documents, the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.

7.9     Amendments and Waivers. This Agreement may be amended or terminated and the observance of any term of this Agreement may be waived with respect to all parties to this Agreement (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the respective Note holders. Notwithstanding the foregoing, (a) this Agreement may not be amended or terminated and the observance of any term hereunder may not be waived with respect to any Purchaser without the written consent of such Purchaser unless such amendment, termination or waiver applies to all Purchasers in the same fashion, (b) the Schedule of Investors hereto may be amended by the Company from time to time in accordance with Section 1.2(a) to add information regarding additional Investors participating in Subsequent Closings without the consent of the other parties hereto. No waivers of or exceptions to any term, condition or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition or provision. Notwithstanding the foregoing, any change to the Outside Closing Date shall not require an amendment of this Agreement, but rather notice shall be sent to any Investors that have participated in prior closings as to such change.

7.10    Severability. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

7.11    Entire Agreement. This Agreement and the documents referred to herein constitute the entire agreement among the parties and no party shall be liable or bound to any other party in any manner by any warranties, representations, or covenants except as specifically set forth herein or therein.

7.12    No Partnership. Nothing contained herein or in any Transaction Document, and no action taken by any Investor pursuant thereto, shall be deemed to constitute the Investors as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Investors are in any way acting in concert or as a group with respect to such obligations

-8-

or the transactions contemplated by the Transaction Document.   Each Investor has been represented by its own separate legal counsel in their review and negotiation of this Agreement and the Transaction Documents.

Balance of Page Intentionally Left Blank

# SIGNATURE PAGE

By execution and delivery of this signature page, you are agreeing to become an Investor as defined in that certain Note Purchase Agreement (the "Purchase Agreement") by and among Emerald Capital Partners, LLC, a New York limited liability company (the "Company") and the Investors (as defined in the Purchase Agreement), dated _____, 2006, and acknowledges having read the representations in the Purchase Agreement section entitled "Representations and Warranties of the Investors," and hereby represents that the statements contained therein are complete and accurate with respect to the undersigned as an Investor. The undersigned further hereby agrees to be bound by the terms and conditions of the Purchase Agreement as an "Investor" hereunder.

INVESTOR:
Print Name: _____

SIGNATURE _____
Title (if entity): _____
Date: _____, 2006
Principal Amount of Note Purchased: $_____
Address: _____
_____
Contact Person: _____
Telephone No.: _____
Fax No.: _____
E-mail Address:_____
Social Security or Federal ID No.: _____

-10-

# Exhibit D

# EMERALD CAPITAL PARTNERS LP

## SUBSCRIPTION AGREEMENT

NAME OF SUBSCRIBER _____
DATE _____
SUBSCRIPTION AMOUNT: $_____

# EMERALD CAPITAL PARTNERS LP

## SUBSCRIPTION AGREEMENT

For Limited Partnership Interests Offered By
Private Placement Memorandum

Ladies and Gentlemen:

This Subscription Agreement (the "Agreement") is to be completed by each person or entity that desires to subscribe ("Subscribers") for Limited Partnership Interests ("Interests") in EMERALD CAPITAL PARTNERS LP, a Delaware Limited Partnership (the "Partnership"). The offering of Interests is being made pursuant to the terms and conditions of the Private Placement Memorandum (the "Memorandum") and the Limited Partnership Agreement (the "LPA") which is attached to the Memorandum as Exhibit A. Subscribers are strongly encouraged to carefully read the Agreement, the Memorandum and the LPA before deciding to subscribe for the Interests.

The information that you will provide in this Agreement will assist the General Partner to determine whether you meet certain required standards for participation in the Partnership. Subscribers are advised that all subscriptions are subject to approval and acceptance by the General Partner. All information required to be provided herein will be kept strictly confidential at all times. However, you hereby agree that the General Partner may present the Agreement to such parties as they deem appropriate in order to assure themselves that the offer and sale of the Interests will not result in violations of federal or state securities laws which are being relied upon by the Partnership in connection with the offer and sale thereof.

1.   **GENERAL**

A. <u>Subscription for Interests of Limited Partnership</u>.  The undersigned hereby irrevocably subscribes for Interests in EMERALD CAPITAL PARTNERS LP, a Delaware Limited Partnership, as set forth herein.

B. <u>Acceptance of Limited Partnership Agreement</u>.  The undersigned agrees that as of the date of acceptance of this subscription by the General Partner, the undersigned shall become a Limited Partner in the Partnership and hereby agrees to each and every term of the Partnership's LPA as if the undersigned's signature were ascribed to the LPA.  The undersigned hereby authorizes the General Partner, as the undersigned's attorney-in-fact, to subscribe the undersigned's name to the LPA pursuant to the Power of Attorney set forth in Section 10 hereof.

## 2.    REPRESENTATIONS AND WARRANTIES

The undersigned recognizes and acknowledges that the Interests have not been, and will not be registered under the Securities Act of 1933, as amended (the "1933 Act"), and to induce the General Partner on behalf of the Partnership to sell the Interests subscribed for herein to the undersigned, the undersigned represents, warrants and covenants to the General Partner and the Partnership as follows:

A.   The undersigned is at least 21 years old, is legally competent and, if signing on behalf of a corporation, partnership, association, trust, unincorporated organization or other entity, is duly authorized to execute this Agreement.

B.   The undersigned recognizes that the Partnership is a highly speculative venture, involving a high degree of financial risk.

C.   The undersigned recognizes that the Interests and the proposed sale of the Interests to the undersigned will not be registered under the Act, and therefore, the Interests may not be sold or otherwise transferred by the undersigned unless the Interests are subsequently registered under the Act or unless, in the opinion of counsel for the Partnership, a sale, assignment or transfer of the Interests may be made without registration thereunder.

D.   The undersigned confirms that undersigned is acquiring the Interests subscribed for herein solely for the undersigned's own account, for investment purposes, and not with a view to the distribution or resale of such Interests.

E.   The undersigned acknowledges having been furnished with the Memorandum and the LPA, which sets forth the relevant terms and conditions of this investment, and such other documents, materials and information as the undersigned (and undersigned's purchaser representative, if any) deems necessary or appropriate for evaluating an investment in the Partnership.   The undersigned confirms that the undersigned (and undersigned's purchaser representative, if any) has read and understands these materials and has made such further investigation of the General Partner and the Partnership as was deemed appropriate to obtain additional information to verify the accuracy of such materials and to evaluate the merits and risks of this investment.   The undersigned acknowledges that the undersigned (and undersigned's purchaser representative, if any) has had the opportunity to ask questions of, and receive answers from, the General Partner concerning the terms and conditions of the offering and the information contained in the offering materials.

F.   The undersigned recognizes that the securities laws and regulations of certain states, including the state of which the undersigned is a resident, may impose additional requirements relating to this offering and undersigned's purchase of the Interests in the Partnership. The undersigned hereby agrees to execute and to comply with the terms of any supplements or amendments to this Agreement which are required by the General Partner.

2

G. The undersigned understands that no federal or state agency has recommended or endorsed the purchase of the Interests as an investment or passed on the adequacy of the information set forth in the Memorandum or any of the other offering materials.

H. The undersigned acknowledges that neither the General Partner nor any person acting on behalf of the General Partner offered to sell, or sold to the undersigned, the Interests by means of any form of general solicitation or general advertising.

I. The undersigned acknowledges that the undersigned has been advised to consult with undersigned's own attorney regarding legal matters concerning the Partnership and to consult with undersigned's tax advisor regarding the tax consequences of participating in the Partnership.

J. If the undersigned is a corporation, partnership, association, trust, unincorporated organization or other entity, the undersigned represents that it (or, if it is a wholly-owned subsidiary, its parent corporation) has not been formed for the specific purpose of making an investment in the Partnership and that the undersigned has the full power and authority under its governing instruments to execute this Agreement on behalf of the undersigned and that the undersigned has the full power and authority under such instruments to become a Limited Partner in the Partnership.

K. If the undersigned is a corporation, partnership, association, trust, unincorporated organization or other entity, the undersigned represents that any equity or other owners of the undersigned share in all the gains or losses of all investments of the Partnership in the same way and on the basis of their proportional ownership and do not have non-proportionate or non-pro rata interests in specified investments of the undersigned. Based on most recent valuations available; (i) less than twenty-five percent (25%) of undersigned's assets are owned by "benefit plan investors" as defined in regulations of the United States Department of Labor concerning those categories of assets that constitute assets of an employee benefit plan, and (ii) the undersigned agrees to notify the General Partner promptly if the percentage of its assets owned by benefit plan investors should equal or exceed twenty-five percent (25%).

L. The undersigned hereby agrees that this subscription is irrevocable and that the representations and warranties set forth in this Agreement shall survive the acceptance hereof by the General Partner.

M. The agreements and representations herein set forth shall become effective and binding upon the undersigned, the undersigned's legal representatives, heirs, successors and assigns, upon the General Partner's acceptance of the undersigned's subscription.

3.    **SUBSCRIBER INFORMATION**

     A.    Name(s) of Subscriber(s):   _____

                                     _____

                                     _____

     B.    Amount of Subscription   _____

     C.    Please check one of the following to indicate your status and complete all appropriate sections as indicated.  The undersigned is:

___a.   Individual              Please complete Sections 3, 4, 5, 6, 9B and 9D.

___b.   Two or More Individuals

     Please check one of the following:

     (i) ___    Husband and Wife
     (ii) ___   Tenants in Common
     (iii) ___  Joint Tenants with Right of Survivorship

                  Please complete Sections 3, 4, 5, 6, 9B and 9D.  Please indicate in each Section the appropriate responses for each individual.  It may be necessary to complete separate Agreements.

___c.   Entity               An Entity includes, but is not limited to, corporations, partnerships, associations, trusts, unincorporated organizations, and limited liability companies.  Please complete Sections 3, 4, 5, 7, 9C and 9D.

___d.   Partnership         See Entity above.

___e.   Trust             See Entity above.

___f.   IRA              Please complete Sections 3, 4, 5, 6, 8, 9B and 9D.

___g.   ERISA Plans       Subscribers who are a pension, profit-sharing, annuity or employee benefit plan (a "Plan") described in the Employee Retirement Income Security Act of 1974 ("ERISA") Please complete Sections 3, 4, 5, 6, 8, 9C and 9D.

4

## 4.     INVESTMENT EVALUATION

Please initial one of the following statements:

A. _____     The undersigned represents that the undersigned has such knowledge and experience in financial and business matters that the undersigned is capable of evaluating the merits and risks of the undersigned's investment in the Partnership and has obtained, in the undersigned's judgment, sufficient information from the General Partner of the Partnership to evaluate the merits and risks of such investment. The undersigned has not utilized any other person as the undersigned's purchaser representative in connection with evaluating such merits and risks.

B. _____     The undersigned has utilized_____(insert name(s) of purchaser representative(s)) to assist the undersigned in connection with evaluating the merits and risks of the undersigned's investment in the Partnership, and such purchaser representative(s) has (have) completed the Purchaser Representative Acknowledgment attached hereto. The undersigned and named purchaser representative(s) together have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of the undersigned's investment in the Partnership, and have obtained sufficient information to evaluate the merits and risks of such investment.

**If you indicated 4B above, you must have your Purchaser Representative complete the Purchaser Representative Acknowledgment attached hereto as Exhibit A.**

## 5.     ACCREDITED INVESTOR STATUS

In order to ensure that the Interests are sold pursuant to appropriate exemptions from registration under the Act, please check one or more of the following definitions of "Accredited Investor," if any, that applies to you. If none of the following applies to you, please complete the Subscriber Questionnaire attached hereto as Exhibit B.

A. _____     I am a natural person whose individual net worth (or joint net worth with my spouse) will exceed $1,000,000 at the time of purchase.

B. _____     I am a natural person who has had individual income (exclusive of any income attributable to a spouse) of more than $200,000 for the past two years or joint income with a spouse of more than $300,000 in each of those years and have a reasonable expectation of reaching the same income level in the current year.

C. _____     The undersigned is an entity in which each equity owner is an accredited investor as defined in A or B above.

5

D. _____   The undersigned is either an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended ("Code"); a corporation, a Massachusetts or similar business trust, or a partnership, in each case not formed for the specific purpose of acquiring the securities being offered, and with total assets in excess of $5,000,000.

E. _____   The undersigned is a trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Interests being offered, whose purchase of the Interests being offered is directed by a person who, either alone or with a purchaser representative, has such knowledge and experience in business and financial matters that undersigned is capable, as defined by the Act, of evaluating the merits and risks of the prospective investment.

F. _____   The undersigned is a bank as defined in Section 3(a)(2) of the Act, as amended, (i) acting in its fiduciary capacity as trustee, or (ii) subscribing for the purchase of securities being offered on its own behalf.

G. _____   The undersigned is an individual retirement account ("IRA") established in the name of a person or persons who is or are accredited investors.

H. _____   The undersigned is an employee benefit plan within the meaning of The Employee Retirement Income Security Act of 1974 ("ERISA") where investment decisions are made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company or registered investment advisor, has total assets in excess of $5,000,000 or is a self-directed plan, with investment decisions made solely by persons that are accredited investors as defined under the Act. If you check this statement, you must complete Section 8B.

**The undersigned certifies that the information contained in the foregoing statement(s) checked by the undersigned is (are) true and correct and hereby agrees to notify the General Partner of any changes which should occur in such information prior to the General Partner's acceptance of this subscription.**

6.   **INDIVIDUAL SUBSCRIBERS**

A. Certification of Non-Foreign Status

The Code provides that, if the Limited Partner is a foreign person, the Partnership must withhold tax on the foreign Limited Partner's proportionate share of dividend and certain interest income received by the Partnership. The undersigned therefore certifies the following:

I ☐ AM ☐ Am Not a nonresident alien for purposes of income taxation;

6

My home address is:   _____

_____

_____

IF "AM NOT" WAS CHECKED

My Social Security Number is   _____.

B.    Please initial the following:

_____a.    I hereby agree that if I become a nonresident alien, I will notify the Partnership within sixty (60) days of doing so.  I understand that this certification may be disclosed to the Internal Revenue Service by the Partnership and that any false statement I have made here could be punished by fine, imprisonment, or both.

_____b.    Under penalties of perjury, I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete.

## 7.    ENTITY SUBSCRIBERS

A.    The undersigned Entity understands that the Partnership will not register as an investment company under the Investment Company Act of 1940, as amended ("1940 Act"), and that for purposes of the provisions of Section 3(c)(1) thereof, does not presently propose to make a public offering of its securities within the United States and the Partnership's Interests therefore may not be beneficially owned by more than one hundred (100) Limited Partners.

### THE UNDERSIGNED HEREBY CERTIFIES AS TO EACH OF THE FOLLOWING STATEMENTS:

The Entity:

☐ is ☐ is not an investment company

☐ is ☐ is not an issuer described under Section 3(c)(1) or Section 3(c)(7) of the Company Act.

B.    Entity Subscribers must initial statements a-e below.

_____a.    The undersigned acknowledges that the Partnership is restricted by law as to the number of beneficial interests held in the Partnership and it may therefore be necessary to count the beneficial owners of the undersigned if it owns ten percent

7

(10%) or more of the Limited Partners' interests in the Partnership. Accordingly, the undersigned agrees to take whatever action the Partnership requests to have undersigned's interest in the Partnership be less than ten percent (10%) of the total interests of Limited Partners and expressly agrees that the General Partner may require the undersigned to withdraw at any time so much of its interest as is necessary to keep such interest below ten percent (10%).

_____ b.   The undersigned was not formed for the purpose of investing in the Partnership and does not invest more than forty percent (40%) of its total assets in any single entity, including the Partnership, which is excluded from the definition of an investment company solely by reason of Section 3(c)(1) of the 1940 Act;

_____ c.   The undersigned was not formed for the purpose of investing in the Partnership nor did or will the shareholders, partners or grantor, as the case may be, of the undersigned contribute additional capital for the purpose of purchasing the Interests herein;

_____ d.   The undersigned's shareholders, partners, beneficiaries or members are not permitted to opt in or out of particular investments made by the undersigned, and each such person participates in investments made by the undersigned pro rata in accordance with its interest in the undersigned; and

_____ e.   The undersigned is not aware of any other circumstances that would require the Partnership to treat it as more than "one person" for purposes of Section 3(c)(1) of the 1940 Act.

C.   <u>Certification of Non-Foreign Status</u>

The Code provides that, if a Limited Partner is a foreign person, the Partnership must withhold tax on the foreign Limited Partner's proportionate share of dividend and certain interest income received by the Partnership. The undersigned therefore certifies on behalf of_____, the Entity, the following:

The Entity ☐ IS ☐ IS NOT a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and Income Tax Regulations);

The office address of the Entity is    _____

_____

_____

IF "IS NOT" WAS CHECKED

8

The U.S. employer identification number of the Entity is _____ ____

Please initial the following:

_____a.    The undersigned hereby agrees to notify the Partnership within sixty (60) days of the date the Entity becomes a foreign person. The undersigned understands that this certification may be disclosed to the Internal Revenue Service by the Partnership and that any false statement contained herein could be punished by fine, imprisonment, or both.

_____b.    Under penalties of perjury, I declare that I have examined this certification and to the best of my knowledge and belief, it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of the Entity.

## 8.    IRA OR PLAN SUBSCRIBERS

A.    Please initial to following statement:

_____    The undersigned recognizes that the Partnership will be operated such that less than twenty-five percent (25%) of the Interests in the Partnership will be owned by "benefit plan investors" within the meaning of the regulations promulgated under ERISA. Accordingly, the undersigned expressly agrees that the General Partner may require the undersigned to withdraw at any time so much of its Interests as is necessary to keep the total Interests of "benefit plan investors" below such twenty-five percent (25%) limit.

B.    If the undersigned checked Section 5H, please provide the following additional information by checking the appropriate response to the following series of questions. The undersigned certifies that the information contained in the following checked statements are true and correct and hereby agrees to notify the General Partner of any changes which should occur in such information prior, or subsequent to the General Partner's acceptance of this subscription.

(a)    Is the undersigned a pension, profit-sharing, annuity or employee benefit plan (a "Plan") described in ERISA, whether or not subject to ERISA, or is the undersigned an entity whose underlying assets include Plan assets by reason of a Plan's investment in the undersigned?

_____ Yes          _____ No

9

(b)   Is the undersigned a Plan which is voluntary?

_____ Yes          _____ No

(c)   Is the undersigned a defined contribution plan?

_____ Yes          _____ No

(d)   Do individual participants in the plan have any right to direct investment in their account?

_____ Yes          _____ No

(e)   If the undersigned is subscribing as a trustee or custodian for an Individual Retirement Account, is the undersigned a qualified IRA custodian or trustee?

_____ Yes          _____ No

(f)    If the answer to each of (c) and (d) above is "yes", please indicate the number of individual participants in the Plan.  If the number is greater than 100, please enter "more than 100".

_____ _____

C.    If a subscriber is a Plan, the undersigned "plan sponsor" (within the meaning of Section 3(16)(B) of ERISA), hereby designates_____ as a "named fiduciary" of the Plan (within the meaning of Section 402(a)(2) of ERISA).

D.    Additional Representations for Employee Benefit Plans

(a) Subscribers who are Plans subject to ERISA, the undersigned fiduciaries of the Plan (i) acknowledge that they have been informed of and understand the investment objectives, policies and investment strategies which may be pursued by the Partnership; (ii) acknowledge they are aware of the provisions of Section 404 of ERISA relating to the requirements for investment and diversification of the assets of employee benefit plans and trusts subject to ERISA; (iii) represent that they have given appropriate consideration to the facts and circumstances relevant to the Plan's investment in the Partnership and have determined that such investment is reasonably designed, as part of the Plan's portfolio, to further the purposes of the Plan; (iv) represent that, taking into account the other investments made with the assets of the Plan, and the diversification thereof, the Plan's investment in the Fund is consistent with the requirements of Section 404 and other provisions of ERISA; and (v) represent that, taking into account the other investments made with the assets of the

10

Plan, the investment of assets of the Plan in the Partnership is consistent with the cash flow requirements and funding objectives of the Plan.

(b) The undersigned also represents that any equity or other owners of the undersigned share in all the gains or losses of all investments of the Partnership in the same way and on the basis of their proportional ownership and do not have non-proportionate or non-pro rata interests in specified investments of the undersigned. Based on most recent valuations available; (i) less than twenty-five percent (25%) of undersigned's assets are owned by "benefit plan investors" as defined in regulations of the United States Department of Labor concerning those categories of assets that constitute assets of an employee benefit plan, and (ii) the undersigned agrees to notify the General Partner promptly if the percentage of its assets owned by benefit plan investors should equal or exceed twenty-five percent (25%).

## 9.   HOT ISSUES

In order for the General Partner to determine the undersigned's eligibility to participate in the Partnership's investment in "hot issues", as defined in the Conduct Rules (the "Conduct Rules")of the National Association of Securities Dealers, Inc. ("NASD"). it is necessary for subscribers to complete Sections 9B or 9C, as applicable, and 9D below.

A.   DEFINITIONS

(a)   "Associated With." A person "associated with" a broker-dealer means any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a broker-dealer or any partner, directly or indirectly controlling or controlled by a broker-dealer or any partner, director, officer or sole proprietor of the broker-dealer.

(b)   "Beneficial Owner." A Beneficial Owner for these purposes includes (i) shareholders of a corporation, (ii) partners, (iii) the grantor of a revocable or grantor trust, (iv) the beneficiaries of an irrevocable trust, (v) the individual who established an IRA, (vi) the participant in a self-directed pension plan or (vii) the sponsor of any other pension plan.

(c)   "Immediate Family." The term Immediate Family includes the undersigned's parents, mother-in-law or father-in-law, husband or wife, brother or sister, brother-in-law or sister-in-law, son-in-law or daughter-in-law and children. The term also includes any other person who supports the undersigned, directly or indirectly, to a material extent, or, in the case of any Entity, any person who supports any Beneficial Owner, defined herein, of the Entity, directly or indirectly, to a material extent.

(d)   "Limited business broker/dealer." A "limited business broker/dealer" is an NASD Member engaged solely in the purchase or sale of either investment

11

company/variable contracts securities or direct participation program securities.

(e)   The phrase "supports directly or indirectly, to a material extent," means that when an Immediate Family member earns a greater yearly income than the undersigned, that Immediate Family member "supports directly or indirectly, to a material extent," the undersigned.

B.   <u>INDIVIDUAL SUBSCRIBERS</u>

(a)   The undersigned subscriber:

☐ is ☐ is not a member of the NASD ("an NASD Member")

☐ is ☐ is not an officer, director, general partner, employee or agent of an NASD Member or of any other broker-dealer, or a person associated with an NASD Member or with any other broker-dealer or a member of any such person's Immediate Family.

(b)   The nature of employment and any other business connections of the undersigned is as follows:

_____

_____

(c)   The undersigned or any member of the undersigned's Immediate Family (check all that apply):

☐ is ☐ is not an officer, director, general partner, sole proprietor, employee or agent of a broker-dealer;

☐ is ☐ is not a person "associated with" a broker dealer.

If you answered yes to either of the two boxes above solely due to a member of the undersigned's Immediate Family, such Immediate Family Member (check one):

☐     "supports directly or indirectly, to a material extent", the undersigned; or

☐     does not "support directly or indirectly, to a material extent", the undersigned.

12

(d)    The undersigned, or any person who supports the undersigned directly or indirectly to a material extent, (check box immediately below if applicable):

☐    owns, or has contributed capital to, a broker/dealer other than solely a "limited business broker dealer" For this purpose a "limited business broker/dealer" is an NASD Member engaged solely in the purchase or sale of either investment company/variable contracts securities or direct participation program securities.

If the box above is checked, check one of the following three boxes:

☐    such person directly or indirectly owns any class of equity securities of, or contributed capital to, the NASD Member know as _____ (fill in name) but the ownership or contribution is passive and less than ten percent (10%) of that NASD Member's equity or capital and either: (a) such person will not purchase hot issues from that NASD Member and cannot direct that NASD Member's allocation of hot issues; or (b) that NASD Member's shares, or the shares of its parent entity, are publicly traded on an exchange or NASDAQ. Please note that any person with an equity ownership or capital interest in an entity that maintains an investment in an NASD Member shall be deemed to have a percentage interest in the NASD Member equal to the percentage interest of the entity in the NASD Member multiplied by the percentage interest of such person in such entity.

☐    such person's account is established for the benefit of bona fide public customers, including insurance company general, separate and investment accounts and bank trust accounts.

☐    Neither of the two boxes immediately preceding this box applies.

(e)    The undersigned or any person who supports, directly or indirectly, to a material extent, the undersigned is (check one):

☐    (i) a senior officer or general partner or (ii) person in the securities department or (iii) an employee or a person who may influence or whose activities directly or indirectly involve or are related to the function of buying or selling securities for any of the following entities:

-    bank, savings and loan institution or insurance company,

13

- investment company (registered or unregistered),
- investment advisory firm (registered or unregistered), or
- any other institutional-type account, including, but not limited to, hedge fund, investment partnership, investment corporation or investment club.

☐ The box immediately preceding this box does not apply.

(f) The undersigned or any person who supports the undersigned, directly or indirectly, to a material extent, is (check all that apply):

☐ a finder in respect of public offerings of securities;

☐ a person acting in a fiduciary capacity to managing underwriters of public offerings of securities, including, among others, attorneys, accountants and financial consultants; or

☐ Neither of two boxes immediately preceding this box applies.

C.    ENTITY SUBSCRIBERS

In order for the General Partner to determine an Entity's eligibility to participate in "hot issues", the Entity must either: 1) fully complete this Section 9C including Schedule X attached hereto listing the names, nature of employment and business connections of each beneficial owner of the Entity; or 2) provide an opinion of counsel representing that none of the beneficial owners of the Entity who participate in hot issues are Restricted Persons under the Conduct Rules.

In order to determine the eligibility of the undersigned entity to participate in the purchase of hot issues, the undersigned hereby represents, warrants, and acknowledges, that:

(a) The undersigned has provided on Schedule X hereto a list of the names and a description of the nature of employment and any other business connection of each person having an ownership interest, direct or indirect, in the undersigned (each such person hereinafter referred to as a Beneficial Owner). If the Beneficial Owner is itself an entity, the information and representations set forth herein must also be given with respect to its Beneficial Owners.

(b) The Beneficial Owner or any Immediate Family Member of any Beneficial Owner of the undersigned entity is (check all that apply):

☐ an officer, director, general partner, sole proprietor, employee or agent of a broker-dealer;

14

☐    a person "associated with" a broker dealer; or

☐    neither of the two boxes immediately preceding this box applies.

If either of the first two boxes above has been checked and applies solely to an Immediate Family Member of a beneficial owner, such Immediate Family Member (check one):

☐    "supports directly or indirectly, to a material extent", the beneficial owner; or

☐    "does not support directly or indirectly, to a material extent," the beneficial owner.

(c)    A beneficial owner or Immediate Family thereof who supports the beneficial owner directly or indirectly, to a material extent, is (check all that apply):

☐    a finder in respect of public offerings of securities;

☐    a person acting in a fiduciary capacity to managing underwriters of public offerings of securities, including, among others, attorneys, accountants and financial consultants; or

☐    Neither of the two boxes immediately preceding this box applies.

(d)    A Beneficial Owner or Immediate Family thereof who supports directly or indirectly, to a material extent, the Beneficial Owner is (check one):

☐    (i) a senior officer or general partner or (ii) person in the securities department or (iii) an employee or a person who may influence or whose activities directly or indirectly involve or are related to the function of buying or selling securities for any of the following entities;

-    bank, savings and loan institution or insurance company,
-    investment company (registered or unregistered),
-    investment advisory firm (registered or unregistered), or
-    any other institutional-type account, including, but not limited to, hedge fund, investment partnership, investment corporation or investment club.

☐    The box immediately preceding this box does not apply.

15

D.   ALL SUBSCRIBERS

Based upon the foregoing Section 9, the undersigned subscriber (a) warrants and represents that he/she; or (b) if the undersigned is an Entity, warrants and represents that it, and any person constituting a Beneficial Owner, of the undersigned,

☐ **DOES**   ☐ **DOES NOT** fall under any one or more of the categories listed in Section 9B or 9C, as applicable.

**The undersigned will notify the General Partner when any representation made herein is no longer accurate.**

## 10.   POWER OF ATTORNEY

The undersigned, by execution of this Agreement, does hereby irrevocably constitute and appoint the General Partner, with power of substitution, as the undersigned's true and lawful attorney-in-fact, in the undersigned's name, place and stead, to execute, acknowledge, swear to (and deliver as may be appropriate) on the undersigned's behalf and file and record in the appropriate public offices and publish (as may in the reasonable judgment of the General Partner be required by law):

A.   The LPA, including any amendments thereto duly adopted as provided therein;

B.   Certificates of Limited Partnership in various jurisdictions, and amendments thereto, and certificates of assumed name or of doing business under a fictitious name with respect to the Partnership;

C.   All conveyances and other instruments which the General Partner deems appropriate to qualify or continue the Partnership in those states and jurisdictions in which the Partnership may conduct business, or which may be required to be filed by the Partnership or the Partners under the laws of any jurisdiction, or to reflect the dissolution or termination of the Partnership or the Partnership being governed by any amendments or to reorganize or re-file the Partnership in a different jurisdiction, provided that such reorganization or re-filing does not result in a material change in the rights of the Partners;

D.   Filing of amended certificates or agreements of limited partnership or other instruments to reflect such admission, to execute and deliver such certificates, agreements and instruments;

E.   Filing, prosecuting, defending, settling or compromising litigation, claims or arbitrations on behalf of the Partnership; and

F.     Making any election permitted to be made by the Partnership under any provision of the Code that the General Partner deems advisable, including, without limitation, an

16

election (or, with the consent of the Commissioner of Internal Revenue, to revoke any election previously made) under Section 754 of the Code to adjust the basis of the Partnership property under Sections 734 and 743 of the Code.

G. Irrevocability. The Power of Attorney granted herein shall be irrevocable and deemed to be a power coupled with an interest and shall survive and shall not be affected by the subsequent incapacity, disability or death of the undersigned. The undersigned agrees to be bound by the representations made by the General Partner and by any successor thereto, acting in good faith pursuant to such Power of Attorney. In addition to the Power of Attorney granted hereby, the undersigned agrees, upon the request of the General Partner, to execute one or more Special Powers of Attorney to the foregoing effect, in form and substance satisfactory to the General Partner, on documents separate from this Agreement. In the event of any conflict between such Special Power of Attorney and the Power of Attorney granted herein or between documents filed pursuant to such Power of Attorney and this Agreement, this Agreement shall control.

IN WITNESS WHEREOF, the undersigned has set undersigned's hand and seal agreeing to the above on the date set forth below.

Date: _____

Subscription Amount

$_____

_____
Print Name of Subscriber

_____
Signature of Subscriber

_____
Tax Identification No. or
Social Security No.

_____
Residence Address
(Post Office Box Not Acceptable)

_____

_____
Mailing Address (If Different)

_____

_____

**ALL SUBSCRIBERS MUST HAVE THEIR SIGNATURES NOTARIZED, SEE PAGE 21.**

<u>ACCEPTANCE</u>

The undersigned, the General Partner of EMERALD CAPITAL PARTNERS LP (a Delaware Limited Partnership), hereby accepts the foregoing subscription this _____ day of _____, _____.

EMERALD ASSET ADVISORS LLC

By:_____
AUTHORIZED SIGNATORY

19

## SUBSCRIBER NOTARY SECTION

### INDIVIDUAL AND IRA SIGNATURES

STATE OF                 )
                            ) ss.:

COUNTY OF            )

On this ____ day of _____, _____, before me personally came _____ ___ _____ _____ to me known and known to me to be the individual(s) described in and who executed the foregoing Subscription Agreement, and duly acknowledged to me that he/she executed the same.

_____ __
Notary Public

### SIGNATURE FOR CORPORATIONS

STATE OF                 )
                            ) ss.:

COUNTY OF            )

On this ____ day of _____, _____, before me personally came _____ to me and known, who, by me duly sworn, did depose and say that deponent resides at _____ _____, that deponent is the _____ of _____, the corporation described in, and which executed the foregoing Subscription Agreement, that the deponent knows the seal of the corporation, that the seal affixed to the Subscription Agreement is the corporate seal, that is was affixed by order of the board of directors of the corporation; and that deponent signed deponent's name by like order.

_____
Notary Public

### FOR PARTNERSHIPS/TRUSTS/PLANS
#### (strike out inapplicable terms)

STATE OF                 )
                            ) ss:

COUNTY OF            )

On the _____ day of _____, _____, before me personally came _____, to me known, who, being by me duly sworn, did depose and say that he resides at _____; that undersigned is Partner/Trustee of _____, the Partnership/Trust described in and which executed the foregoing Subscription Agreement, who duly acknowledged to me that he had full power and authority to sign undersigned's name thereto.

_____
Notary Public

## EXHIBIT A

### EMERALD CAPITAL PARTNERS LP

(A Delaware Limited Partnership)

### PURCHASER REPRESENTATIVE ACKNOWLEDGMENT

The undersigned hereby acknowledges that undersigned is the purchaser representative (as the term is defined in Rule 501 promulgated under the Act) of _____ (the "Subscriber"). By reason of the undersigned's knowledge and experience in business and financial matters in general, and the business of investment in securities in particular, the undersigned believes himself capable of evaluating, and has in fact evaluated, the merits and risks of this investment on behalf of the Subscriber. The undersigned further acknowledges that undersigned received a Private Placement Memorandum dated (the "Memorandum"), and any other information that the undersigned deemed appropriate to evaluate this investment. Furthermore the undersigned acknowledges that undersigned had the opportunity to ask questions of, and receive satisfactory answers or documentation from, the General Partner, or its affiliates, associates or employees concerning the terms and conditions of the offering and the information contained in the Memorandum.

The undersigned is not an officer, director, employee or affiliate of the Partnership or owner of ten percent (10%) or more of the equity interest in the Partnership, and except as otherwise previously disclosed by the undersigned to the Subscriber in writing, neither the undersigned nor any affiliate of the undersigned currently has, or has had during the past two (2) years, or contemplates having in the future, any material relationship with the Partnership or its affiliates. The undersigned has disclosed to the Subscriber the source, and extent of, any and all remuneration received as compensation for the undersigned's services as purchaser representative.

_____          _____
Signature of Representative                Street Address

_____          _____
Print Name of Representative               City                       State

_____          (____)_____
Occupation                                 Telephone

## PURCHASER REPRESENTATIVE NOTARY SECTION

### INDIVIDUAL SIGNATURES

STATE OF                  )
                           ) ss.:

COUNTY OF             )

On this _____ day of _____, _____, before me personally came _____ _____ to me known and known to me to be the individual(s) described in and who executed the foregoing Purchaser Representative Acknowledgment, and duly acknowledged to me that he/she executed the same.

_____
Notary Public

### SIGNATURE FOR CORPORATIONS

STATE OF                  )
                           ) ss.:

COUNTY OF             )

On this _____ day of _____, _____, before me personally came _____ to me and known, who, by me duly sworn, did depose and say that deponent resides at _____ _____, that deponent is the _____ of_____, the _____ corporation described in, and which executed the foregoing Purchaser Representative Acknowledgment, that the deponent knows the seal of the corporation, that the seal affixed to the Purchaser Representative Acknowledgment is the corporate seal, that is was affixed by order of the board of directors of the corporation; and that deponent signed deponent's name by like order.

_____
Notary Public

### FOR PARTNERSHIPS
(strike out inapplicable terms)

STATE OF                  )
                           ) ss:

COUNTY OF             )

On the _____ day of_____, ____ before me personally came _____, to me known, who, being by me duly sworn, did depose and say that he resides at _____ _____; that undersigned is Partner/Trustee of _____, the Partnership/Trust described in and which executed the foregoing Purchaser Representative Acknowledgment, who duly acknowledged to me that he had full power and authority to sign undersigned's name thereto.

_____
Notary Public

# EXHIBIT B

2

## SUBSCRIBER QUESTIONNAIRE

1. <u>IDENTIFICATION OF OFFEREE</u>:

             Mr.                                  SOCIAL

Name: Ms. _____    SECURITY NO. _____

           Other _____    FEDERAL ID#. _____

RESIDENCE ADDRESS: ____ _____ _____ _____ ___

                        City          State        Zip

DATE OF BIRTH: _____       MARITAL STATUS: _____

TELEPHONE (_____) _____

Do you maintain a house or apartment in any other state: Yes _____ No _____

If yes, please indicate which state(s) _____

2. <u>PRINCIPAL BUSINESS OR OCCUPATION</u>:

PRESENT OCCUPATION: _____

BUSINESS NAME:_____

ADDRESS:_____

          City              State          Zip

Description of Business Activities (indicate all aspects reflecting knowledge regarding financial matters)

_____

_____

_____

Business Activities During Past Five Years (if different than above)

_____

_____

3. <u>EDUCATIONAL BACKGROUND</u>: Complete applicable items, if any:

|  | Course | Degree |
|---|---|---|
| College | _____ | _____ |
| Graduate | _____ | _____ |
| Other (specify) | _____ | _____ |

Do you have additional educational background, business experience, or positions with business or other organizations bearing on your knowledge in the fields of accounting, economics, business administration, finance, taxation, securities laws or law in general, financial analysis or related fields? If so, briefly describe:

_____

_____

_____

_____

4. <u>ABILITY TO BEAR ECONOMIC RISK OF INVESTMENT</u>:

A. The undersigned Subscriber has had the following annual gross income for each of the two most recent years (Please Check):

<u>Last Year</u>

___ $69,000-99,000
___ $100,000-149,000
___ $150,000-199,000
___ $200,000+

<u>Year Before Last</u>

___ $69,000-99,000
___ $100,000-149,000
___ $150,000-199,000
___ $200,000+

B. The undersigned Subscriber anticipates that his/her gross income for the current calendar year will be (Please Check):

___ $69,000-99,000                    ___ $150,000-199,000

2

# Exhibit E

# EMERALD
### ASSET ADVISORS

January 19, 2007

Dear Investor,

Thank you for investing with Emerald Asset Advisors for the purchase of Tobacco Holdings Inc. As we discussed, a separate company, Sandstone Investment Partners, has been established through the Hedge Fund Emerald Asset Advisors for the specific purpose of purchasing Tobacco Holdings. The ultimate goal is to significantly increase sales and subsequently sell the company to a pre-arranged private buyer. Remember, the buyer is seeking to purchase a tobacco company with sustained sales of at least 400,000 cartons of cigarettes per month.

The purchase of Tobacco Holdings is scheduled to take place on or about February 1, 2007. Once the purchase occurs, you will receive the "Promissory Note" document and the "Note Purchase Agreement" document, which will require signatures. The proceeds raised for the purchase were accumulated during the month of December 2006 and have been placed in a separate contribution account at HSBC for the sole purpose of the Tobacco Holdings purchase. When discussing these balances with those involved in the deal, we thought it fair, for the investors, to begin accruing interest as of January 1, 2007. Quarterly statements will therefore coincide with calendar quarters and will be processed at the end of March, June, September and December. If you elected to receive quarterly payments, they will be mailed at the same time. If you chose to continually compound the interest, a statement will be mailed denoting the current balance.

Since our initial meeting in September 2006, we have remained vigilant in our quest to amass as many sales agreements as possible, as well as build the business organically, before the actual purchase of Tobacco Holdings. This strategy will help us hit the ground running. These agreements are scheduled to become effective once Tobacco Holdings is contractually sold to Sandstone Investment Partners. With this in mind, and as part of an ongoing effort, we plan to deliver periodic updates as to the progress and changes of the venture. Please find the updates as follows:

- Organic sales have been averaging 90,000 / month...up from 30,000
- Agreement with Berlin Tobacco is 200,000 / month
- Agreement with a tobacco company in China has been reached for 50,000 / month
- Negotiations are being finalized with several tobacco companies in Venezuela, Italy, Russia and China
- Agreement with a domestic company in Michigan has been reached for 100,000 / month

425 Broad Hollow Road, Melville, New York 11747 · tel 631.396.3950 · fax 631.396.3969



- Agreement has been reached with Onondaga Indian Nation in Syracuse for 18,000 / month
- Agreement has been reached with an Indian Nation in Washington for 18,000 / month
- Agreement has been reached with 2 NY distributors for 6,000 / month

Due to confidentiality agreements, the names associated with many of the agreements must remain confidential until business commences.

As you can see, we have made great strides already and have established a pipeline for future potential sales. Going forward, we will continue with these and additional efforts. If you have any questions, feel free to contact me at 631-396-3950, or you can direct your questions to John.

Best regards,

Michael Xirinachs

# EXHIBIT F

# EMERALD
## ASSET ADVISORS

### INVESTOR STATEMENT

| EAA - 7002 - 0101 - AS-A | 03 / 31 / 07 |
|---|---|
| 01 / 01 / 07 | $265,000.00 |
| | $279,157.39 |

**Account of:**

AIS VENTURES, LLC
35-1812 HUDSON STREET
JERSEY CITY, NEW JERSEY 07302

*EMERALD ASSET ADVISORS*
*425 BROAD HOLLOW ROAD*
*SUITE 115*
*MELVILLE, NEW YORK  11747*

Charges, payments and/or additional investments made after the statement date will appear on next statement.

## •••••• EMERALD ASSET ADVISORS ••••••
### Call 1-631-396-3950 with Questions on your Account

| TRANS DATE | REFERENCE | CHARGES | CREDITS |
|---|---|---|---|
| 01/01/07 | INITIAL INVESTMENT | $0.00 | $265,000.00 |
| 03/31/07 | Interest Earned - First Quarter | $0.00 | $14,157.39 |
| 03/31/07 | Total Balance | $0.00 | $279,157.39 |
| 04/15/07 | Less Interest Paid | $0.00 | $0.00 |
| 04/15/07 | Ending Balance | $0.00 | $279,157.39 |

| Previous Balance | Total Credits | Total Charges | Current Balance |
|---|---|---|---|
| $265,000.00 | $14,157.39 | $0.00 | $279,157.39 |

## •••••••••••WE APPRECIATE YOUR BUSINESS•••••••••••



## EMERALD
### ASSET ADVISORS

**VESTOR STATEMENT**

| EAA - 7002 - 0101 - AS-A | 06 / 30 / 07 |
|---|---|
| 01 / 01 / 07 | $265,000.00 |
| | $294,071.12 |

**Account of:**

AIS VENTURES, LLC
35-1812 HUDSON STREET
JERSEY CITY, NEW JERSEY 07302

*EMERALD ASSET ADVISORS*
*425 BROAD HOLLOW ROAD*
*SUITE 115*
*MELVILLE, NEW YORK  11747*

---

Charges, payments and/or additional investments made after the statement date will appear on next statement.

### ······ EMERALD ASSET ADVISORS ······
#### Call 1-631-396-3950 with Questions on your Account

| TRANS DATE | REFERENCE | CHARGES | CREDITS |
|---|---|---|---|
| 01/01/07 | INITIAL INVESTMENT | $0.00 | $265,000.00 |
| 03/31/07 | Interest Earned - First Quarter | $0.00 | $14,157.39 |
| 03/31/07 | Previous Balance | $0.00 | $279,157.39 |
| 06/30/07 | Interest Earned - Second Quarter | $0.00 | $14,913.73 |
| 06/30/07 | Ending Balance | $0.00 | $294,071.12 |

| Previous Balance | Total Credits | Total Charges | Current Balance |
|---|---|---|---|
| $279,157.39 | $14,913.73 | $0.00 | $294,071.12 |

### ·········"WE APPRECIATE YOUR BUSINESS"·············



**INVESTOR STATEMENT**

| EAA - 7002 - 0101 - AS-B | 06 / 30 / 07 |
| --- | --- |
| 04 / 01 / 07 | $60,324.26 |
| | $63,547.03 |

Account of:

ANDREW I. SMOLER
35-1812 HUDSON STREET
JERSEY CITY, NEW JERSEY 07302
|||...||||..|||...|||||...|||..||..||||...||...||||

EMERALD ASSET ADVISORS
425 BROAD HOLLOW ROAD
SUITE 115
MELVILLE, NEW YORK  11747
|||...||...|....||||.....||||...||...|...|..|..|..|....|||.|...||..||||

Charges, payments and/or additional investments made after the statement date will appear on next statement.

## •••••• EMERALD ASSET ADVISORS ••••••
### Call 1-631-396-3950 with Questions on your Account

| TRANS DATE | REFERENCE | CHARGES | CREDITS |
| --- | --- | --- | --- |
| 04/01/07 | INITIAL INVESTMENT | $0.00 | $60,324.26 |
| 06/30/07 | Interest Earned - First Quarter | $0.00 | $3,222.77 |
| 06/30/07 | Ending Balance | $0.00 | $63,547.03 |
| | Interest Earned - Second Quarter | $0.00 | $0.00 |

| Previous Balance | Total Credits | Total Charges | Current Balance |
| --- | --- | --- | --- |
| $60,324.26 | $3,222.77 | $0.00 | $63,547.03 |

## •••••••••••WE APPRECIATE YOUR BUSINESS•••••••••••••



**EMERALD**
ASSET ADVISORS

| INVESTOR STATEMENT | |
|---|---|
| EAA - 7002 - 0101 - AS-A | 09 / 30 / 07 |
| 01 / 01 / 07 | $265,000.00 |
| | $309,781.61 |

**Account of:**

AIS VENTURES, LLC
35-1812 HUDSON STREET
JERSEY CITY, NEW JERSEY 07302

*EMERALD ASSET ADVISORS*
*425 BROAD HOLLOW ROAD*
*SUITE 115*
*MELVILLE, NEW YORK  11747*

Charges, payments and/or additional investments made after the statement date will appear on next statement.

## •••••• EMERALD ASSET ADVISORS ••••••
### Call 1-631-396-3950 with Questions on your Account

| TRANS DATE | REFERENCE | CHARGES | CREDITS |
|---|---|---|---|
| 01/01/07 | INITIAL INVESTMENT | $0.00 | $265,000.00 |
| 03/31/07 | Interest Earned - First Quarter | $0.00 | $14,157.39 |
| 06/30/07 | Interest Earned - Second Quarter | $0.00 | $14,913.73 |
| 09/30/07 | Interest Earned - Third Quarter | $0.00 | $15,710.49 |
| 09/30/07 | Ending Balance | $0.00 | $309,781.61 |

| | Previous Balance | Total Credits | Total Charges | Current Balance |
|---|---|---|---|---|
| | $294,071.12 | $15,710.49 | $0.00 | $309,781.61 |

### •••••••••••"WE APPRECIATE YOUR BUSINESS"••••••••••••



**INVESTOR STATEMENT**

| EAA - 7002 - 0101 - AS-B | 09 / 30 / 07 |
|---|---|
| 04 / 01 / 07 | $60,324.26 |
| | $66,941.97 |

Account of:

ANDREW I. SMOLER
35-1812 HUDSON STREET
JERSEY CITY, NEW JERSEY 07302

*EMERALD ASSET ADVISORS*
*425 BROAD HOLLOW ROAD*
*SUITE 115*
*MELVILLE, NEW YORK  11747*

Charges, payments and/or additional investments made after the statement date will appear on next statement.

## •••••• EMERALD ASSET ADVISORS ••••••
### Call 1-631-396-3950 with Questions on your Account

| TRANS DATE | REFERENCE | CHARGES | CREDITS |
|---|---|---|---|
| 04/01/07 | INITIAL INVESTMENT | $0.00 | $60,324.26 |
| 06/30/07 | Interest Earned - First Quarter | $0.00 | $3,222.77 |
| 09/30/07 | Interest Earned - Second Quarter | $0.00 | $3,394.94 |
| 09/30/07 | Ending Balance | $0.00 | $66,941.97 |

| Previous Balance | Total Credits | Total Charges | Current Balance |
|---|---|---|---|
| $63,547.03 | $3,394.94 | $0.00 | $66,941.97 |

### ••••••••••••"WE APPRECIATE YOUR BUSINESS"••••••••••••••

# EXHIBIT G

19/00  2006  12:42  FAX  ☒010



# EMERALD
### ASSET ADVISORS

July 11, 2007

Re: Sandstone Partners

Dear Investor,

Enclosed please find your interest check and/or statement for the calendar quarter ending June 30, 2007.

*Once again* I find it necessary to communicate with each of you the purchasing delay of Tobacco Holdings by Sandstone Partners. *Once again*, the reason for the delay is the painstaking process of dealing with government agencies. *Once again*, the deal is fully funded and ready to close. *Once again* we wait for the bureaucracy.

Our legal council and I continually speak with the appropriate government agencies and comply with every request as we await "clean title" for each brand. Dealing with this bureaucracy, whether it is on the Federal, State or Local level is unfortunately unavoidable, time consuming and apparently par for the course. If you have ever dealt with government agencies, I am sure you can appreciate and share in the frustration of our endeavors. I will continue to forge ahead to bring this deal to fruition.

In the interim and while our efforts are being held at bay by bureaucratic process, please know that the underpinnings of the deal have not changed. We continue to build the pipeline both organically and through multiple sales agreements due to take effect once Sandstone contractually purchases Tobacco Holdings. These sales agreements in Germany, China, Russia, Italy, Venezuela and the United States currently approximate 500,000 plus cartons per month.

Your principal investment, interest and back-end bonus will not be compromised and we thank you for understanding the detainment. As always, feel free to contact either John or me at any time.

Best regards,

*Michael Xirinachs*
General Partner

# EXHIBIT H



**EMERALD**
A S S E T  A D V I S O R S

October 1, 2007

Re: Sandstone Partners

Dear Investor,

Enclosed please find your interest check and/or statement for the calendar quarter ending September 30, 2007.

Unfortunately, the progress with the outstanding states remains at a standstill. We are no closer to resolving the issues at hand today then we were months ago. The major stumbling block is still the *potential* outstanding issue of not receiving the brands free and clear of past encumberances. The states themselves have been unable to put a monetary value (if any) on these *potential* judgments. We have continuously tried to negotiate these *potential* monetary issues with various settlement options and the states have continuously rejected our offers.

I have come to the conclusion that we have only one option remaining. We will advise our legal team to present one final offer for the states to either accept or reject and we will also place a time parameter, or a "drop dead date", of November 30, 2007, for their decision. If we cannot agree on a solution by that date, we will end our pursuit of Tobacco Holdings. At that time, the investors will receive their principal and appropriate interest.

As I have stated in the past, it is much too risky to proceed without the clean title to the brands, and even though we have the ability to proceed, I will not put your investment at risk. I hope you can appreciate my approach to this situation by taking seriously my fiduciary responsibility of protecting principal. If this deal does not come to fruition, there will be others and I hope you will consider them as we move forward. I am sure John will contact you individually as he has a better understanding of your personal financial situations.

Best regards,

Michael Xirinachs
General Partner

# EXHIBIT I

# EMERALD
## ASSET ADVISORS

December 10, 2007

Re:  Sandstone Partners

Dear Investor,

As a follow up to the October 1st investor update, the purchase of Tobacco Holdings by Sandstone Partners will not occur.  It is simply too risky to proceed without full closure from all the outstanding states.

During the course of the next few weeks I will unwind the Sandstone Partner interest in purchasing Tobacco Holdings and refund the principal and appropriate interest as of November 30, 2007 to the investors.  If you have specific instructions as to where the money should be sent, please contact John with the wire or mailing details. The refunding should occur in mid January 2008.

At this time, I would like to thank you for your participation and patience during this process.  I am sure John will keep you apprised of additional opportunities that will arise in the future.

Best regards,

Michael Xirinachs
General Partner